ANN WAGNER, ESQ.    Fax:781-834-0509    Jun 15 '06  10:07   P.04
Sent By: WHITE,INKER,ARONSON,P.C

# WHITE, INKER, ARONSON, P.C.

### ATTORNEYS AT LAW

MONROE L. INKER
JOHN P. WHITE, JR.
FRANCES M. GIORDANO
PATRICIA M. BLACKBURN
CLAIRE O. TUTWILER
JULIE R. HESS
DIANE M. D'AMICO

January 31, 2005

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603

TELEPHONE 617-367-7700
TELEFAX 617-523-5035
E-MAIL office@wislaw.com

OF COUNSEL
MARTIN L. ARONSON

Louis P. Georgantas, Esq.
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210

Re:   *David R. Geiger/Qualified Domestic Relations Orders*

Dear Attorney Georgantas:

We were before Judge Kopelman this past Friday, January 28th, and addressed, among other things, the Qualified Domestic Relations Orders for Mr. Geiger's three retirement plans. The judge was prepared to sign the orders, and questioned why the forms required the signature of the parties. He ordered us to find out from the plan administrators why this is the case, as he does not want the QDROs to be bounced back once he signs them. In accordance with my conversation with you a few weeks ago, I drafted the QDRO for the plan you administer, the retirement trust for the benefit of David Geiger, in the same format as that provided for the retirement plans administered by New York Life. I enclose a copy for your review, and would ask that you respond in writing.

In addition to the Keogh, Ms. Leeds is awarded a certain amount in the judgment from Mr. Geiger's New York Life 401k and Money Purchase Plan, which is how these accounts were referred to by all parties throughout the trial. The forms received back from New York Life, however, refer to the Money Purchase Plan and a Savings and Retirement Plan. Judge Kopelman has also required us to determine that the New York Life 401k is, in fact, properly designated as the Savings and Retirement Plan. Ms. Leeds was awarded the amount of $345,912 from the New York Life 401k and Money Purchase Plan, combined. If these accounts are held separately, and a figure needs to be determined for them separately, please let me know.

Thank you in advance for your prompt attention to this matter. I appreciate your continued assistance.

Very truly yours,

Frances M. Giordano

FMG/th
Enclosure
cc:   Ms. Karen Leeds (w/encl.)
      Mr. David R. Geiger (w/encl.)


EXHIBIT

PAGE.02        781 834 0509                        JAN 11 2007 15:54

received

Foley Hoag LLP Savings and Retirement Plan
c/o New York Life Investment Management
P.O. Box 940
Norwood, MA  02062-0940



*Benefits Complete*®
□PLAN INFORMATION

(800) 294-3575

Information provided by
New York Life Investment Management ("NYLIM")

December 23, 2004

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Karen Leeds

Re:    Domestic Relations Order Package

Enclosed please find a MODEL QUALIFIED DOMESTIC RELATIONS ORDER ("Model QDRO") for the Foley Hoag LLP Savings and Retirement Plan ("401(k) Plan"), the Foley Hoag LLP Money Purchase Pension Plan ("Pension Plan") and a copy of each plan's QUALIFIED DOMESTIC RELATIONS ORDER PROCEDURES ("Procedures").

The model QDROs contain pre-approved language specific to each plan and qualification requirements for domestic relations orders mandated under Section 414(p) of the Internal Revenue Code. Please feel free to use all or any part of the Model QDROs. Use of the Model QDROs generally shortens the review period and quickens the approval of the domestic relations order.

The Procedures outline the requirements for qualification of a domestic relations order and the plan administrator's procedures for determining whether a domestic relations order constitutes a qualified domestic relations order.

Also, enclosed are DOMESTIC RELATIONS ORDER INFORMATION REQUEST FORMS for each plan. If you require additional information, please indicate the requested information on the enclosed DOMESTIC RELATIONS ORDER INFORMATION REQUEST FORMS and forward the completed forms to the address shown below:

New York Life Investment Management, P.O. Box 940, Norwood, MA  02062-0940

*If you choose to express mail your form(s) to New York Life Investment Management, please use Priority Service Mail (through the U.S. Postal Service), since most private express or overnight mail services will not deliver to a Post Office Box.*

If you have any questions about the above, please provide your questions in writing to NYLIM.

Thank you for using *Benefits Complete*®.

cc:    Louis P. Georgantas, Esq.
       David R. Geiger, Esq.
       Fran Giordano, Esq.



EXHIBIT 2

WHITE, INKER, ARONSON, P.C.
ATTORNEYS AT LAW

MONROE L. INKER
JOHN P. WHITE, JR.
FRANCES M. GIORDANO
PATRICIA M. BLACKBURN
CLAIRE C. TUTWILER
JULIE R. HESS
DIANE M. D'AMICO

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603
TELEPHONE 617-367-7700
TELEFAX 617-523-5085
E-MAIL: office@wialaw.com

OF COUNSEL
MARTIN L. ARONSON

December 27, 2004

David R. Geiger, Esq.

Re:    *Karen Leeds v. David R. Geiger*
       Norfolk Probate & Family Court
       Docket No. 99D-1578-DV1

Dear David:

Now that you have received a copy of the Model Qualified Domestic Relations Orders, as have I, I do not believe there should be any further delay to your preparing the documents. Please forward to me for my review at your earliest convenience, so that I will have ample time to look at it before the January 12th hearing.

Very truly yours,

Frances M. Giordano

FMG/th

cc:    Ms. Karen Leeds

EXHIBIT 1

## WHITE, INKER, ARONSON, P.C.
### ATTORNEYS AT LAW

MONROE L. INKER
JOHN F. WHITE, JR.
FRANCES M. GIORDANO
PATRICIA M. BLACK BURN
CLAIRE D. TUTWILER
JULIE R. HESS
DIANE M. D'ALMCO

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603

TELEPHONE 617-367-7700
TELEFAX 617-523-5085
E-MAIL: office@wishw.com

OF COUNSEL
MARTIN L. ARONSON

January 6, 2005

Louis P. Georgantas, Esq.
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210

Re:  *David R. Geiger/Qualified Domestic Relations Orders*

Dear Mr. Georgantas:

I enclose for your review drafts of Qualified Domestic Relations Orders for the Foley Hoag LLP Money Purchase Pension Plan and Savings and Retirement Plan pursuant to the Judgment of Divorce entered between David R. Geiger and Karen Leeds. I will be presenting them to the Court on Wednesday, January 12, 2005, and would appreciate hearing from you if you do not believe the Orders meet all of the required qualifications. I did use the forms provided to me for these plans.

Thank you for your attention to this matter.

Very truly yours,

Frances M. Giordano

FMG/th
Enclosure

cc:    Ms. Karen Leeds (w/encl.)
       Mr. David R. Geiger (w/encl.)

EXHIBIT 2

 Investment
Management LLC



NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02062
T 781 440-2000  F 781 440-2296

## NOTICE OF QUALIFICATION
## OF DOMESTIC RELATIONS ORDER

January 14, 2005

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Frances M. Giordano, Esq.
White, Inker, Aronson, P.C.
One Washington Mall
Boston, MA 02108

RE:    Foley Hoag LLP Money Purchase Pension Plan ("Plan")
       Qualified Domestic Relations Order for Karen Leed and David R. Geiger
       (No. 99D-1578-DVI)

Dear Attorney Giordano:

The Plan Administrator's designee has determined that the domestic relations order ("Order") referenced above, when entered by the Court, would be considered a qualified domestic relations order as defined in Section 414(p) of the Internal Revenue Code. Outlined below is a summary of the Plan Administrator's designee's understanding of how the Order is to be administered.

> **Name and Address of Participant and Alternate Payee -**

   *Participant:*         David R. Geiger (S.S. #        )

   *Alternate Payee:*     Karen Leeds (S.S. #        7)

> **Amount of Benefit Assigned to Alternate Payee -** The Alternate Payee is awarded 100% of the Participant's vested account balance under the Plan as of May 26, 2004. The amount assigned to the Alternate Payee will be subject to applicable gains and losses based on the investment options in which such amount is invested for the period between May 26, 2004 and the date of distribution.

   The Plan Administrator will establish a separate account under the Plan in the name of the Alternate Payee and in the amount of the benefit assigned to the Alternate Payee above. The amount assigned to the Alternate Payee will be taken from the Participant's vested account on a pro-rata basis from the Participant's investment elections in effect on the date the Alternate Payee's account is established ("set investment elections"). The Alternate Payee's account will continue to be invested in the set investment elections, subject to subsequent change by the Alternate Payee.


EXHIBIT 2



Investment
Management LLC

NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02062
T 781 440-2000 F 781 440-2296

Frances M. Giordano, Esq.
January 14, 2005
Page 2

> *Investment Options* - Following the establishment of the Alternate Payee's account, the Alternate Payee may change the investment of her assigned benefit and invest said benefit in any of the investment options offered under the Plan by calling *Benefits Complete®* at (800) 294-3575.

> *Form of Benefit Payment to Alternate Payee* - The Alternate Payee shall receive the benefit assigned on her behalf in accordance with one of the payment options available to the Participant in the Plan as elected by the Alternate Payee; provided, however, that the Alternate Payee may not elect to receive a joint and survivor annuity and name a subsequent spouse as a joint annuitant.

> *Commencement of Benefit Payment to Alternate Payee* - The Alternate Payee may elect to commence distribution of her benefit assigned under the Order at any time after the Plan Administrator has determined that the Order constitutes a Qualified Domestic Relations Order ("QDRO") within the meaning of Section 414(p) of the Code by filing the appropriate distribution form with the Plan Administrator; provided, however such date is not later than the "required beginning date" as set forth in Section 401(a)(9) of the Internal Revenue Code and the regulations thereunder.

> *Death of Alternate Payee and/or Participant* - The death of the Participant will not affect the payment of benefit assigned to the Alternate Payee under the Order.

> If the Alternate Payee dies before her interest has been distributed, the Alternate Payee's benefit will be paid in a single-sum cash payment to the beneficiary named by the Alternate Payee.

> *Participant's Beneficiary Designation* - If it is the Participant's intent to remove his former spouse as his designated beneficiary under the Plan, the Participant must complete a new Beneficiary Designation Form available from *Benefits Complete®* and return it to the address indicated on the form. Please note that a Qualified Domestic Relations Order ("QDRO"), Final Decree of Divorce, Settlement Agreement, or other court order does not automatically change the Participant's designated beneficiary.

If you disagree with any part of this summary, you must request that the Plan Administrator's designee review its findings. Your request for a review must set forth the reasons upon which it is based, and provide any other information you feel would be helpful. Please send in writing all comments and responses to: *New York Life Investment Management, P.O. Box 940, Norwood, MA 02062-0940.*

The Plan Administrator's designee will act upon any request for review it receives and within 30 days will inform the Participant, the Alternate Payee, and their representatives in writing of its decision.

If a request for review is not received by the Plan Administrator's designee on or before February 14, 2005 **and the Plan Administrator's designee is in receipt of an executed copy of the Order,** the Plan Administrator's designee will authorize the final qualification of the Order, establish an account for the Alternate Payee, and direct that it be administered as outlined above. **Please note that the Alternate Payee may not elect to commence distribution of her account until the date set forth in the**

PAGE.07        781 834 0509        JAN 11 2007 15:52



NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02062
T 781 440-2000  F 781 440-2296

Investment
Management LLC

Frances M. Giordano, Esq.
January 14, 2005
Page 3

section above entitled "Commencement of Benefit Payment to the Alternate Payee" and the review period noted above has expired.

Sincerely,

New York Life Investment Management
for the Foley Hoag LLP Money Purchase Pension Plan Administrator

cc:    David R. Geiger – *via certified mail – return receipt requested*
       Karen Leeds - *via certified mail – return receipt requested*
       Louis P. Georgantas – *Foley Hoag LLP*

JAN 11 2007 15:58    781 834 0509    PAGE.08


Investment
Management LLC

NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02062
T 781 440-2000  F 781 440-2296

# NOTICE OF QUALIFICATION
## OF DOMESTIC RELATIONS ORDER received 1-19-05

January 14, 2005

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Frances M. Giordano, Esq.
White, Inker, Aronson, P.C.
One Washington Mall
Boston, MA 02108

RE:  Foley Hoag LLP Savings and Retirement Plan ("Plan")
     Qualified Domestic Relations Order for Karen Leed and David R. Geiger
     (No. 99D-1578-DVI)

Dear Attorney Giordano:

The Plan Administrator's designee has determined that the domestic relations order ("Order") referenced above, when entered by the Court, would be considered a qualified domestic relations order as defined in Section 414(p) of the Internal Revenue Code. Outlined below is a summary of the Plan Administrator's designee's understanding of how the Order is to be administered.

> **Name and Address of Participant and Alternate Payee** –

   Participant:      David R. Geiger (S.S. # ..............)

                     ...................................

   Alternate Payee:  Karen Leeds (S.S. #2..)

                     ...................

> **Amount of Benefit Assigned to Alternate Payee** – The Alternate Payee is awarded 100% of the Participant's vested account balance under the Plan as of May 26, 2004. The amount assigned to the Alternate Payee will be subject to applicable gains and losses based on the investment options in which such amount is invested for the period between May 26, 2004 and the date of distribution.

   The Plan Administrator will establish a separate account under the Plan in the name of the Alternate Payee and in the amount of the benefit assigned to the Alternate Payee above. The amount assigned to the Alternate Payee will be taken from the Participant's vested account on a pro-rata basis from the Participant's investment elections in effect on the date the Alternate Payee's account is established ("set investment elections"). The Alternate Payee's account will continue to be invested in the set investment elections, subject to subsequent change by the Alternate Payee.


EXHIBIT 2

**NEW YORK LIFE** Investment
Management LLC

NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02062
T 781 440-2000 F 781 440-2296

Frances M. Giordano, Esq.
January 14, 2005
Page 2

> *Investment Options* - Following the establishment of the Alternate Payee's account, the Alternate Payee may change the investment of her assigned benefit and invest said benefit in any of the investment options offered under the Plan by calling *Benefits Complete®* at (800) 294-3575.

> *Form of Benefit Payment to Alternate Payee* – The Alternate Payee shall receive the benefit assigned on her behalf in a single-sum payment.

> *Commencement of Benefit Payment to Alternate Payee* – The Alternate Payee may elect to commence distribution of her benefit assigned under the Order at any time after the Plan Administrator has determined that the Order constitutes a Qualified Domestic Relations Order ("QDRO") within the meaning of Section 414(p) of the Code by filing the appropriate distribution form with the Plan Administrator; provided, however such date is not later than the "required beginning date" as set forth in Section 401(a)(9) of the Internal Revenue Code and the regulations thereunder.

> *Death of Alternate Payee and/or Participant* – The death of the Participant will not affect the payment of benefit assigned to the Alternate Payee under the Order.

> If the Alternate Payee dies before her interest has been distributed, the Alternate Payee's benefit will be paid in a single-sum cash payment to the beneficiary named by the Alternate Payee.

> *Participant's Beneficiary Designation* – If it is the Participant's intent to remove his former spouse as his designated beneficiary under the Plan, the Participant must complete a new Beneficiary Designation Form available from *Benefits Complete®* and return it to the address indicated on the form. Please note that a Qualified Domestic Relations Order ("QDRO"), Final Decree of Divorce, Settlement Agreement, or other court order does not automatically change the Participant's designated beneficiary.

If you disagree with any part of this summary, you must request that the Plan Administrator's designee review its findings. Your request for a review must set forth the reasons upon which it is based, and provide any other information you feel would be helpful. Please send in writing all comments and responses to: *New York Life Investment Management, P.O. Box 940, Norwood, MA 02062-0940.*

The Plan Administrator's designee will act upon any request for review it receives and within 30 days will inform the Participant, the Alternate Payee, and their representatives in writing of its decision.

If a request for review is not received by the Plan Administrator's designee on or before February 14, 2005 and the Plan Administrator's designee is in receipt of an executed copy of the Order, the Plan Administrator's designee will authorize the final qualification of the Order, establish an account for the Alternate Payee, and direct that it be administered as outlined above. Please note that the Alternate Payee may not elect to commence distribution of her account until the date set forth in the section above entitled "Commencement of Benefit Payment to the Alternate Payee" and the review period noted above has expired.

PAGE.10          781 834 0509          JAN 11 2007 15:59

 **Investment Management LLC**

NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02062
T 781 440-2000  F 781 440-2296

Frances M. Giordano, Esq.
January 14, 2005
Page 3


Sincerely,

New York Life Investment Management
for the Foley Hoag LLP Money Purchase Pension Plan Administrator .

cc:  David R. Geiger — *via certified mail — return receipt requested*
     Karen Leeds  - *via certified mail — return receipt requested*
     Louis P. Georgantas — *Foley Hoag LLP*

FEB-10-2005 08:14 AM   David R. Geiger                    1 781 431 1411              P.02

David R. Geiger


February 10, 2005

**BY FAX**

Frances M. Giordano, Esq.
White, Inker, Aronson, P.C.
One Washington Mall
Boston, MA 02108

Re: <u>Leeds v. Geiger, Norfolk Probate Court, No. 99-D-1578-DV1</u>

Dear Fran:

     I had a chance to look at your motion for clarification and also to look at my files. Based on that review, it would be fine with me if you prepared a new assented-to and very brief motion asking for an order clarifying that the reference to the "401K" plan in paragraph 12 of the judgment is intended to refer to the "Savings and Retirement" Plan. As grounds, you could say that the plan is more properly referred to by that name (though, to my knowledge, it <u>is</u> a 401(k) plan) and that I assent to this clarification without waiver of all of my objections to the judgment as thus clarified. Presumably we could present this motion to Judge Kopelman when we are there in March and he will allow that just as he did the other clarifications about the Fidelity IRA plan really being a Keough plan and to correct the erroneous Fidelity account number.

     Please call me at the office at 617-832-1124 to let me know whether this makes sense to you. I look forward to hearing from you. Best regards.

Very truly yours,



David R. Geiger

EXHIBIT 2

# WHITE, INKER, ARONSON, P.C.
ATTORNEYS AT LAW

MONROE L. INKER
JOHN P. WHITE, JR
FRANCES M. GIORDANO
PATRICIA M. BLACKBURN
CLARE C. TUTWILER
JULIE R. HESS
DIANE M. D'AMICO

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603

TELEPHONE 617-367-7700
TELEFAX 617-523-5083
E-MAIL: office@wialaw.com

OF COUNSEL
MARTIN L. ARONSON

March 9, 2005

## PERSONAL & CONFIDENTIAL

David R. Geiger, Esq.

b.        ....O

Re:    *Karen Leeds v. David R. Geiger*
       Norfolk Probate & Family Court
       Docket No. 99D-1578-DV1

Dear David:

As a follow-up to the Assented-To Motion for Clarification of Judgment dated February 14, 2005, you were to provide information as to the balance in the Foley Hoag retirement plans by March 3, 2005. Please let me have this information at your earliest convenience, so that I may revise the QDROs accordingly.

Thank you for your attention to this matter.

Very truly yours,

Frances M. Giordano

FMG/th

cc:    Ms. Karen Leeds

EXHIBIT 2

# WHITE, INKER, ARONSON, P.C.
### ATTORNEYS AT LAW

MONROE L. INKER
JOHN P. WHITE, JR.
FRANCES M. GIORDANO
PATRICIA M. BLACKBURN
CLAIRE C. TUTWILER
JULIE R. HESS
DIANE M. D'AMICO

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603
TELEPHONE 617-367-7700
TELEFAX 617-523-5085
E-MAIL: office@wialaw.com

OF COUNSEL
MARTIN L. ARONSON

March 16, 2005

*Via Hand Delivery*

**PERSONAL & CONFIDENTIAL**

David R. Geiger, Esq.

> Re:   *Karen Leeds v. David R. Geiger*
>       Norfolk Probate & Family Court
>       Docket No. 99D-1578-DV1

Dear David:

   I enclose a Stipulation of Dismissal regarding the orthodontist issue. Karen has decided not to pursue this action at this time. Please sign and return to me at your earliest convenience by fax, with the original by mail or hand delivery. This will eliminate the need for your depositions. Karen still intends to go forward with the remaining provisions of her January 21, 2005 Contempt, and the October 1, 2004 Contempt on March 29, 2005. To that end, I enclose the final version of the Qualified Domestic Relations Orders to be signed by the judge. As you will see, the only item missing is the account balances that you need to provide. If you have any proposed changes to the QDROs, please get them to me within seven (7) days, so that we can address any problems well before the court hearing.

   Thank you for your prompt attention to these matter.

Very truly yours,

Frances M. Giordano

FMG/th
Enclosures

cc:   Ms. Karen Leeds (w/encl.)

 EXHIBIT 2

# WHITE, INKER, ARONSON, P.C.
### ATTORNEYS AT LAW

MONROE L. INKER
JOHN P. WHITE, JR.
FRANCES M. GIORDANO
PATRICIA M. BLACKBURN
CLAIRE C. TUTWILER
JULIE R. HESS
DIANE M. D'AMICO

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603

TELEPHONE 617-367-7700
TELEFAX 617-523-5085
E-MAIL: office@wislaw.com

OF COUNSEL

MARTIN L. ARONSON

March 21, 2005

*via facsimile*

NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02063

Re:    *David R. Geiger/Qualified Domestic Relations Orders*

Dear Sir/Madam:

In January, 2005, you approved a QDRO for Mr. Geiger's Money Purchase Pension Plan and Savings and Retirement Plan. At that time, the amount of benefit assigned to the alternate payee was 100%. That figure has now been changed to reflect a specific dollar amount. Otherwise, the documents are identical to those you approved previously. I anticipate having the judge sign these documents on March 29th, and thus would appreciate if you could notify me if you foresee any problems.

Thank you in advance for your prompt attention to this matter. I appreciate your continued assistance.

Very truly yours,

Frances M. Giordano

FMG/th
Enclosure
cc:    Ms. Karen Leeds (w/encl.)
       Mr. David R. Geiger (w/encl.)
       Mr. Louis Georgantas, Esq. (W/ encl.)

EXHIBIT  2

David R. Geiger

March 21, 2005

**BY TELECOPIER**

Frances M. Giordano, Esq.
White, Inker, Aronson, P.C.
One Washington Mall
Boston, MA 02108

Re: Leeds v. Geiger, Norfolk Probate Court, No. 99-D-1578-DV1

Dear Fran:

I have not yet had a chance to review the draft QDROs that you sent me, but I have checked into the balances of the savings and retirement and money purchase plans. In so doing, I have verified that the amounts utilized in the court's judgment of $345,912 for the plans combined, i.e., $263, 415 and $82,497, respectively, are still available. This should give you the information that you need for your motion. Best regards,

Very truly yours,

David R. Geiger

EXHIBIT 2

David R. Geiger

March 31, 2005

NYLIM Retirement Plan Services
846 University Avenue
Norwood, MA 02063

Re: <u>Leeds v. Geiger, Norfolk Probate Court, No. 99-D-1578-DV1</u>

Dear Sir or Madam:

I do not know who you are, but I recently received a copy of a letter from plaintiff's counsel in the above case addressed to you and dated March 21, 2005. In that letter, counsel claimed that several <u>months</u> ago, in January, 2005, you "approved a QDRO" for <u>my</u> "Money Purchase Pension Plan and Savings and Retirement Plan."

Please be advised that I have never previously heard of any such "approval" by you, whoever you may be, nor have I ever received any notice from you that you were considering any such "approval." Nor, as of the date of counsel's letter, had the court issued any orders that might even conceivably be considered a qualified domestic relations order.

I am unaware of any procedure under ERISA whereby anyone, whether a plan administrator or any other person, is authorized to "approve" as a qualified domestic relations order any document not issued by a court, nor to do so without notice to a plan beneficiary. I hope in the future that if you do bear some relation to any qualified retirement plan in which I have an interest you will manage to act in conformity with the law.

Thank you for your prompt attention to this matter.

Very truly yours,

David R. Geiger

cc:    Frances M. Giordano, Esq.


EXHIBIT 3

David R. Geiger

July 29, 2005

**BY HAND**

Louis P. Georgantas, Esq.
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210

Re: <u>Leeds v. Geiger, Norfolk Probate Court, No. 99-D-1578-DV1</u>

Dear Lou:

 This is to respond to your "preliminary determination," apparently acting as a responsible partner of Foley Hoag LLP, administrator of the Foley Hoag LLP Retirement Plan (the "Plan"), and as set forth in your letter of May 5, 2005, that a certain order in the above matter dated March 29, 2005 (the "Order") constitutes a qualified domestic relations order ("QDRO") under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"). As you know, you did not provide me with a copy of the Order or notice that the Plan had received it until June 3, 2005, and did not provide me with the Plan's purported procedures for determining whether the Order constitutes a QDRO until June 14, 2005. In your letter of July 15, 2005, you agreed that I had until 5 p.m. on July 29, 2005 to object to your preliminary determination.

 Without waiving, and indeed fully preserving, <u>all</u> objections and rights that I have under ERISA or otherwise, I object to your preliminary determination on at least the following grounds:

 **1. Lack of Plan Procedures**. First, the Plan has <u>not</u> complied with the requirement of ERISA § 206 that "[e]ach plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." 29 U.S.C. § 1056(d)(3)(G)(ii). The document that you provided me in response to my request for a copy of the Plan's procedures, entitled "Qualified Domestic Relations Order Procedures," nowhere identifies itself as procedures promulgated by the Plan. The document is not dated, nor is it signed by anyone purporting to act on behalf of the Plan. Moreover, the document is not found anywhere on the Foley Hoag word processing system, and does not have the standard identification of a Foley Hoag document. You also have not responded to the request in my letter of June 13, 2005 to let me know how the Plan's procedures were established and pursuant to what provisions of the Plan. I conclude from this that the Plan simply never promulgated any procedures as required by the Act and pursuant to the Plan. Accordingly, it is unlawful for the Plan to proceed with respect to the Order until the Plan properly promulgates such procedures.



**2. Plan Procedures' Non-Compliance with ERISA.** Second, even if the purported procedures were actually and properly promulgated by the Plan, they do not comply with ERISA. As just noted, § 206 of the Act requires a plan to promulgate "reasonable" procedures.

The procedures you produced are confusing, unintelligible and internally contradictory, and hence are not reasonable on that ground alone. The purported procedures contain all sorts of provisions about responding to drafts of orders, which are completely unauthorized by ERISA. The procedures also provide that you will notify the participant of any determination by you that a domestic relations order constitutes a QDRO, but not of your <u>reasons</u> for such determination, which again is not a "reasonable" procedure. Moreover, one of the core requirements of § 206 is that "[i]n the case of any domestic relations order received by a plan . . . the plan administrator shall promptly notify the participant and any alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders." 29 U.S.C. § 1056(d)(3)(G)(i)(I); while your purported procedures provide for prompt notice of receipt of an order (a provision with which you did not comply in this case), they do <u>not</u> provide for prompt notice of the plan's procedures (nor did you give such notice in this case). Similarly, § 206 expressly mandates that a plan's procedures "shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan . . . of such procedures promptly upon receipt by the plan of the domestic relations order," 29 U.S.C. § 1056(d)(3)(G)(ii)(II) (emphasis added), and your purported procedures contain no such provision. Accordingly, it is unlawful for the Plan to proceed with respect to the Order until the Plan promulgates procedures that meet the requirements of the Act.

**3. Lack of Prompt Notice of Plan's Receipt of Order.** Third, as set forth in my June 13 letter, the Plan violated § 206 by failing to give me prompt notice of the Plan's receipt of the Order.

**4. Lack of Prompt Notice of Plan Procedures.** Fourth, as also set forth in my June 13 letter, the Plan violated § 206 by failing to give me prompt notice of the Plan's procedures for determining if the Order was a QDRO.

**5. Order Not a QDRO.** Fifth, beyond these and other procedural failings, the Order itself is <u>not</u> a QDRO, for numerous reasons.

As an initial matter, it is important to note that, as you know, as plan administrator Foley Hoag is a fiduciary under the Act, 29 U.S.C. § 1002(21)(A), and therefore you are required to "discharge [your] duties with respect to a plan <u>solely</u> in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1) (emphasis added), here <u>myself</u>, "for the <u>exclusive</u> purpose of . . . providing benefits to participants," <u>id.</u> § 1104(a)(1)(A) (emphasis added), again <u>myself</u>. <u>Accordingly, so long as there is any discretion available to you under ERISA and the Plan, you are required under ERISA to exercise that discretion in *my* favor and to provide Plan benefits to me, not plaintiff.</u>[1]

---

[1] I am aware that 29 U.S.C. § 1056(d)(3)(J) provides that "[a] person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan," but by its own terms that would make a person such as

Against this background, the Order is not a QDRO because it does not constitute a "judgment, decree, or order . . . which . . . relates to the provision of . . . marital property rights to a . . . former spouse . . . pursuant to a State domestic relations law," as required by § 206. 29 U.S.C. § 1056(d)(3)(B)(ii)(I)-(II).

First, the phrase "judgment, decree, or order" must be interpreted to mean such an order which is final, rather than merely provisional, under state law. As far as I am aware, there is no Supreme Court or First Circuit authority resolving this issue. Given its lack of clarity, the statute must be interpreted to effectuate its purposes, which are, among other things, to secure "the continued well-being and security of millions of employees" such as myself, 29 U.S.C. § 1001(a), to "protect . . . the interests of participants [such as myself] in employee benefit plans," id. § 1001(b), and to prohibit the alienation of pension benefits to third parties except in narrow circumstances, §§ 1056(d)(1), (d)(3)(A). It would be grossly contrary to these purposes if pension benefits could be permanently lost (obviously, once transferred to a third party such benefits can be immediately withdrawn and expended, albeit with a tax penalty, or dissipated by investment) pursuant to a state court order that is ultimately found unlawful and hence reversed on appeal. Nor, in the statute's own terms, would such an unlawful order in fact be "pursuant to a State domestic relations law." Moreover, as noted above, in accordance with your fiduciary obligation to me you are obligated to interpret any ambiguity in the statute in my favor.[2] In the present case, the Order is not final as both the judgment pursuant to which the Order was issued as well as the Order itself have been timely appealed.

Second, the Order does not "relate[] to the provision . . . of marital property rights." Massachusetts law does not provide either spouse any property rights, but rather makes the assignment of property interests by the court completely discretionary or arbitrary. Mass. Gen. L. ch. 208, § 34 (providing that based on unguided consideration of a hodgepodge of factors the court "may" assign property of one ex-spouse to the other). Marital property "rights" would likely exist only in a community property jurisdiction. See Senate Report No. 98-575, pp. 18-9 (purpose of enactment of QDRO provisions is to resolve uncertainty whether ERISA preempts

---

plaintiff a beneficiary only after the Order is determined to be a QDRO. Until that point, however, and hence in determining whether the Order is a QDRO, you are a fiduciary bound to act solely in my interest and for the purpose of providing me Plan benefits.

[2] The conclusion that Act contemplates a final order is further supported by § 206's provisions for an extended period during which "the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise)," 29 U.S.C. § 1056(d)(3)(H)(i), and requirements that (1) while the issue is being determined benefits that might be assigned if the order were in fact a QDRO be separately accounted for, id., (2) if the order is determined within eighteen months to be a QDRO the assigned amount be paid to the specified alternate payee, 29 U.S.C. § 1056(d)(3)(H)(ii), (3) if proceedings extend beyond eighteen months the benefits revert to the participant, id. § 1056(d)(3)(H)(iii), and (4) any later determination that the order is a QDRO "be applied prospectively only," id. § 1056(d)(3)(H)(iv). Under these provisions, the determination whether an order is a QDRO can readily include a determination whether the order has become final.

state law permitting attachment of benefits to meet "family support obligations" and "preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan") (emphasis added).

Third, the Order was not in fact issued "pursuant to a State domestic relations law," but rather contrary to same, which is precisely why the Order and judgment on which it is based are on appeal. Among other things, and without revealing details as the judgment involves personal and private matters and both it as well as all other papers in the action are impounded, the property provisions of the judgment are clearly unlawful in that:

A. As a matter of Massachusetts law, "[a] judge shall disqualify himself . . . where . . . the judge has a personal bias or prejudice concerning a party," SJC Rule 3:09, Canon 3E(1)(a) (emphasis added), or even when "the judge's impartiality might reasonably be questioned," id., Canon 3E(1). Here the judge unlawfully refused to disqualify himself despite the facts, among others, that he (1) had previously disqualified my longtime counsel on purported ethical grounds after refusing to hear argument and refusing to read the memorandum, case law and affidavits that I submitted in opposition to her disqualification (even though he expressly promised to do so), (2) exhibited a hostile tone and body language in so ruling, (3) immediately proceeded to rule on other matters even though I expressly stated I wished to exercise my fundamental right to be represented by counsel before proceeding further, and (4) shortly before trial was informed both that I had filed a previously confidential ethics complaint against him *and* that the Commission on Judicial Conduct had determined that the complaint alleged facts which, if true, "would constitute misconduct."

B. Under long-established Massachusetts law, married persons may contract with each other in the same manner as single persons, Mass. Gen.L. ch. 209, § 2 ("[a] married woman may make contracts, oral and written, sealed and unsealed, in the same manner as if she were sole, and may make such contracts with her husband"), and contracts may be created both by express words and by implication, including from conduct, e.g., Mass. Gen. L. ch. 106, § 1-201 ("the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing"); Moore v. Goddard, 147 Mass. 287, 292 (1888) ("agreement implied by the course of dealing"). Moreover, no state law, including Mass. Gen. L. ch. 208, § 34, authorizes the abrogation of inter-spousal or any other private contracts, nor could any law constitutionally do so. The undisputed evidence at trial was that the parties had a contract about their financial affairs, both by express words and 21 years of conduct, yet the judge unlawfully abrogated that contract in the property provisions of the judgment.

C. Under ch. 208, § 34, marriage is a partnership that terminates once "both [parties] cease[] to hold themselves out to the community as a married couple, and there [is] no further marital relationship," and neither ex-spouse may be awarded any portion of the increase in the other's assets accumulating thereafter, Savides v. Savides, 400 Mass. 250, 251-2 (1987), including subsequent retirement plan

contributions and appreciation, <u>Daugherty</u> v. <u>Daugherty</u>, 50 Masss. App. Ct. 738, 741 (2001); <u>Kuban</u> v. <u>Kuban</u>, 48 Mass. App. Ct. 387 (1999). Despite these legal requirements, the judge proceeded to award plaintiff property, including the proceeds of dividend reinvestments and other accumulations in the Plan itself, acquired after the date on which, on the undisputed evidence, the marital partnership terminated.

D. As a matter of Massachusetts law, a trust providing that principal may be paid in trustees' "discretion" for specified purposes for a spouse's benefit creates a "present, enforceable, equitable right to use the trust property for [her] benefit" and must be included in marital property to be divided under ch. 208, § 34. <u>Comins</u> v. <u>Comins</u>, 33 Mass. App. Ct. 28, 30-1 (1992). Despite this rule, the judge excluded <u>two</u> trusts from marital property which made principal payable to plaintiff for specified purposes; moreover, the judge excluded one trust despite <u>including</u> another that had identical terms.

In addition to the above, the Order is also not a QDRO because it does not meet several other requirements for such an order. For one thing, the Order fails to "clearly specif[y]" the "plan to which such order applies," as required by ERISA § 206. 29 U.S.C. § 1056(d)(3)(C)(iv). Here, the Order states that it pertains to the "Foley Hoag LLP Keogh Plan." Order ¶ I.A.

As is evident both from your letters and the Plan documents, however, that is <u>not</u> the name of the Plan of which Foley Hoag is the administrator. The Act's requirements must be strictly interpreted, as the QDRO rules create a very limited exception to the general ERISA requirement that pension benefits may not be alienated for creditors or otherwise, <u>id.</u> §§ 1056(d)(1), (d)(3)(A), and to conclude otherwise would "do[] violence to the plain meaning of the statute," <u>Hawkins</u> v. <u>Commissioner of Internal Revenue</u>, 86 F. 3d 982, 992 (10th Cir. 1996) ("[n]owhere . . . has Congress implied that its factual requirements are optional; indeed, the language rather plainly states that a QDRO 'must clearly specify certain facts.' . . . To accept anything less . . . would contravene the Supreme Court's frequent admonition that courts must not read language out of a statute."). Thus even if you were to subjectively believe or "know" that the Order "really" intended to specify the Plan, this would <u>not</u> satisfy the statutory requirement. <u>Id.</u> Indeed, your own purported procedures recognize that to constitute a QDRO an order must "specif[y] . . . [t]he <u>full name of the Plan</u> . . . to which it applies," which the Order does not.

Second, the Order fails to "clearly specif[y] . . . the amount . . . of the participant's benefits to be paid . . . to each such alternate payee, or the manner in which such amount . . . is to be determined," as also required by § 206. 29 U.S.C. § 1056(d)(3)(C)(ii). Here the Order provides that plaintiff is "awarded . . . $246,866 adjusted for any investment gains and losses . . . for the period between the date an account is established for the benefit of [plaintiff] and the date of distribution," Order ¶ II.A., and that the "Administrator is hereby instructed to establish a separate account under the Plan in the name of [plaintiff] and in the amount of the benefit assigned to [plaintiff] pursuant to II.A," <u>id.</u> ¶ II.B.

These provisions woefully fail the "clearly specifies" test. For one thing, my benefits under the Plan are not held in cash but in varying numbers of shares of a variety of mutual funds. Yet the Order refers solely to a dollar amount, which fails to "clearly specif[y]" which shares from which funds are to be transferred. Moreover, the provision that plaintiff is to be awarded a dollar amount adjusted by investment gains or losses between the date an account is established for plaintiff and the "date of distribution" does not "clearly specif[y]" anything. Since the Order directs the Plan to establish a separate account for plaintiff in the amount of the benefit assigned, it is not clear what is meant by the undefined term "date of distribution" as the dollar amount (if it had been properly specified in other than pure cash terms) would be "distributed" as soon as it was placed in plaintiff's account. Further, even if the "date of distribution" had been "clearly specifie[d]" as a date different from that of plaintiff's account funding it would be impossible to determine investment gains and losses between the two dates given the Order's failure to specify which shares of which funds were to be used in the calculation. In addition, the Order's failure to specify the dates of either plaintiff's account funding or "distribution" render the assigned benefit amount subject to caprice and hence not "clearly specifie[d]."[3]

In addition, the Order fails to "clearly specif[y] . . . the . . . period to which such order applies," i.e., the date for the benefit assignment, as also required by § 206. 29 U.S.C. § 1056(d)(3)(C)(iii). The Order contains no provision whatsoever as to when the benefit assignment is to be made.

Based on the foregoing, as well as all other applicable grounds, you are required by the fiduciary and definitional provisions of ERISA to find that the Order is not a QDRO.

Very truly yours,

David R. Geiger

cc:    Michael P. Boudett, Esq.

---

[3] Under your own purported procedures, plaintiff's account would not be created and funded until after some party chose to provide you with the Order, a "reasonable period" passed for you to determine whether it constituted a QDRO and thirty more days passed without objection by either party to your determination; if there was an objection, the account could not be funded until the dispute was "resolve[d]."

David R. Geiger

August 12, 2005

New York Life Investment Management
P.O. Box 940
Norwood, MA 02062-0940

Re: Leeds v. Geiger, Norfolk Probate Court, No. 99-D-1578-DV1

Dear Sir or Madam:

　　　This is to respond to your "Final Notice of Qualification of Domestic Relations Order"
dated July 8, 2005 with respect to the Foley Hoag LLP Savings and Retirement Plan, and second
notice of the same title and date with respect to the Foley Hoag LLP Money Purchase Pension
Plan (the foregoing plans each being hereinafter referred to as the "Plan"), both purporting to
"determine[]," acting "for the [unidentified] Plan Administrator," that an order in the above
matter with respect to each Plan dated March 29, 2005 (each individually the "Order"), "as
supplemented by separate orders dated March 29, 2005 and June 1, 2005," constitutes a qualified
domestic relations order ("QDRO") under the Employee Retirement Income Security Act of
1974 ("ERISA" or the "Act").[1]  As you know, you did not provide me with a copy of the Order
or notice that the Plan had received it until your July 8 letter, and did not provide me with the
Plan's purported procedures for determining whether the Order constitutes a QDRO until the
same time.

　　　Without waiving, and indeed fully preserving, all objections and rights that I have under
ERISA or otherwise, I object to your determination on at least the following grounds:

　　　**1. Lack of Plan Procedures.**  First, the Plan has not complied with the requirement of
ERISA § 206 that "[e]ach plan shall establish reasonable procedures to determine the qualified
status of domestic relations orders and to administer distributions under such qualified orders."
29 U.S.C. § 1056(d)(3)(G)(ii).  The document that you provided me, entitled "Qualified
Domestic Relations Order Procedures," nowhere identifies itself as procedures promulgated by
or even relating in any way to the Plan.  The Plan name nowhere appears, the document is not
dated and it is not signed by anyone purporting to act on behalf of the Plan.  I conclude from this
that the Plan simply never promulgated any procedures as required by the Act and pursuant to
the Plan.  Moreover, to the extent the procedures actually relate to the Plan and were issued by
"New York Life Investment Management," that is not a legal entity and both you and the Plan
administrator have repeatedly refused to comply with my request pursuant to 29 U.S.C. §
1024(b)(4) to provide me with copies of all contracts, votes, resolutions or other documents
evidencing the power of anyone, including by not limited to "New York Life Investment
Management," to act on behalf of the Plan with respect to QDRO issues, so any such procedures

---

[1] All of my comments herein apply separately to each Plan and Order.



would be without legal authority. Accordingly, it is unlawful for the Plan to proceed with respect to the Order until the Plan properly promulgates such procedures.

**2. Plan Procedures' Non-Compliance with ERISA.** Second, even if the purported procedures were actually and properly promulgated by the Plan, they do not comply with ERISA. As just noted, § 206 of the Act requires a plan to promulgate "reasonable" procedures.

The procedures that you produced are confusing, unintelligible and internally contradictory, and hence are not reasonable on that ground alone. The purported procedures contain all sorts of provisions about responding to drafts of orders, which are completely unauthorized by ERISA. The procedures also provide that you will notify the participant of any determination by you that a domestic relations order constitutes a QDRO, but not of your reasons for such determination with reference to the numerous particular requirements of the Act, which again is not a "reasonable" procedure.[2] The procedures also fail to require notice to the participant of his legal right to challenge any determination that an order constitutes a QDRO in federal court, which reasonable procedures again would require.

Moreover, one of the core requirements of § 206 is that "[i]n the case of any domestic relations order received by a plan . . . the plan administrator shall promptly notify the participant and any alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders." 29 U.S.C. § 1056(d)(3)(G)(i)(I); while your purported procedures provide for notice of receipt of an order within five business days (arguably not "prompt," but in any event a provision with which you did not comply in this case), they do not provide for prompt—or indeed any—notice of the plan's procedures (nor did you give such notice in this case). Similarly, § 206 expressly mandates that a plan's procedures "shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan . . . of such procedures promptly upon receipt by the plan of the domestic relations order," 29 U.S.C. § 1056(d)(3)(G)(ii)(II) (emphasis added), and your purported procedures contain no such provision. Accordingly, it is unlawful for the Plan to proceed with respect to the Order until the Plan promulgates procedures that meet the requirements of the Act.

**3. Lack of Prompt Notice of Plan's Receipt of Order.** Third, as set forth in previous communications from me, the Plan violated § 206 (and, indeed, your own purported procedures) by failing to give me prompt notice of the Plan's receipt of the Order.

**4. Lack of Prompt Notice of Plan Procedures.** Fourth, as also set forth in my previous communications, the Plan violated § 206 by failing to give me prompt notice of the Plan's procedures for determining if the Order was a QDRO.

---

[2] Notably, your purported procedures require a statement of reasons for concluding that an order is not a QDRO, but not for the equally, if not more, critical conclusion that it is! The procedures also contain the nonsensical requirement that a conclusion that an order is a QDRO be accompanied by an "outline [of] the terms and conditions of the Order," when any order would speak for itself and any summary or outline could not vary the order's terms.

- 2 -

**5. Unlawful Alienation of Vested Benefits.** Fifth, by its own admission in the purported qualification notice, the Plan has violated § 206 of the Act by "establish[ing] a separate account under the Plan in the name of the Alternate Payee and in the amount of the benefit assigned," and funding this account by amounts "segregated from [my] vested account on a pro-rata basis from [my] investment elections in effect on the date the Alternate Payee's account was established" (a date that is not specified in the notice).

Again, under ERISA, funds may not be transferred from my account until *after* notice of receipt of the order in question, opportunity for me to respond as to whether it constitutes a QDRO and determination of that issue by the plan administrator and, if necessary, a federal court. 29 U.S.C. § 29 U.S.C. § 1056(d)(3)(H)(i)-(iii). Moreover, even under your client's *own* purported procedures, it is only after your client has sent a "Notice of Qualification" purporting to determine that an order is a QDRO *and* thirty days have passed without any interested party disputing this determination that "the Plan Administrator shall establish a separate account for the Alternate Payee"; your client has only just sent the notice in question, and the thirty days have not yet passed.

**6. Lack of Capacity or Authority to Send Qualification Notice.** Sixth, your purported qualification notice was not sent by any legal person. The notice is unsigned, contains no name or title of the purported sender, purports generally to be from "New York Life Investment Management," not a valid corporate or other legal entity name, purports to be for a "Plan Administrator" who is not identified and does not specify how the unidentified sender has authority on behalf of the Plan, its unidentified administrator or "New York Life Investment Management." Moreover, to the extent the notice was sent by or on behalf of "New York Life Investment Management," both you and the Plan administrator have repeatedly refused to comply with my request pursuant to 29 U.S.C. § 1024(b)(4) to provide me with copies of all contracts, votes, resolutions or other documents evidencing the power of anyone, including by not limited to "New York Life Investment Management," to act on behalf of the Plan with respect to QDRO issues, so the notice was without legal authority.

**6. Lack of Required Time to Respond.** Seventh, your purported qualification notice asserts that any request for review by me must be "received" by you "on or before August 7, 2005," thirty days from the date you apparently *sent* your notice. This is in plain violation of the terms of your own purported procedures, which provide me "thirty (30) calendar days [from] receipt" of your notice to "mail[]" any objection to your purported QDRO determination.

**6. Order Not a QDRO.** Eighth, beyond these and other procedural failings, the Order itself is in any event *not* a QDRO, for numerous reasons.

As an initial matter, it is important to note that, as you know, as plan administrator Foley Hoag is a fiduciary under the Act, 29 U.S.C. § 1002(21)(A), and therefore both Foley Hoag and you, if indeed you are a valid legal entity and the administrator's lawful agent or delegate, are required to "discharge [your] duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1) (emphasis added), here *myself*, "for the exclusive purpose of . . . providing benefits to participants," *id*. § 1104(a)(1)(A) (emphasis added), again *myself*. Accordingly, so long as there is any discretion available to either Foley Hoag or you

under ERISA and the Plan, you are required under ERISA to exercise that discretion in *my* favor and to provide Plan benefits to *me*, not plaintiff.[3]

Against this background, the Order is not a QDRO because it does not constitute a "judgment, decree, or order . . . which . . . relates to the provision of . . . marital property rights to a . . . former spouse . . . pursuant to a State domestic relations law," as required by § 206. 29 U.S.C. § 1056(d)(3)(B)(ii)(I)-(II).

First, the phrase "judgment, decree, or order" must be interpreted to mean such an order which is final, rather than merely provisional, under state law. As far as I am aware, there is no Supreme Court or First Circuit authority resolving this issue. Given its lack of clarity, the statute must be interpreted to effectuate its purposes, which are, among other things, to secure "the continued well-being and security of millions of employees" such as myself, 29 U.S.C. § 1001(a), to "protect . . . the interests of participants [such as myself] in employee benefit plans," id. § 1001(b), and to prohibit the alienation of pension benefits to third parties except in narrow circumstances, §§ 1056(d)(1), (d)(3)(A). It would be grossly contrary to these purposes if pension benefits could be permanently lost (obviously, once transferred to a third party such benefits can be immediately withdrawn and expended, albeit with a tax penalty, or dissipated by investment) pursuant to a state court order that is ultimately found unlawful and hence reversed on appeal. Nor, in the statute's own terms, would such an unlawful order in fact be "pursuant to a State domestic relations law"; rather, it would be contrary to such law. Moreover, as noted above, in accordance with your fiduciary obligation to me you are obligated to interpret any ambiguity in the statute in my favor.[4] In the present case, the Order is not final as both the judgment pursuant to which the Order was issued as well as the Order itself have been timely appealed.

---

[3] I am aware that 29 U.S.C. § 1056(d)(3)(J) provides that "[a] person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan," but by its own terms that would make a person such as plaintiff a beneficiary only after the Order is determined to be a QDRO. Until that point, however, and hence in determining whether the Order is a QDRO, you are a fiduciary bound to act solely in my interest and for the purpose of providing me Plan benefits.

[4] The conclusion that the Act contemplates a final order is further supported by § 206's provisions for an extended period during which "the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise)," 29 U.S.C. § 1056(d)(3)(H)(i), and requirements that (1) while the issue is being determined benefits that might be assigned if the order were in fact a QDRO be separately accounted for, id., (2) if the order is determined within eighteen months to be a QDRO the assigned amount be paid to the specified alternate payee, 29 U.S.C. § 1056(d)(3)(H)(ii), (3) if proceedings extend beyond eighteen months the benefits revert to the participant, id. § 1056(d)(3)(H)(iii), and (4) any later determination that the order is a QDRO "be applied prospectively only," id. § 1056(d)(3)(H)(iv). Under these provisions, the determination whether an order is a QDRO can readily include a determination whether the order has become final.

Second, the Order does not "relate[] to the provision . . . of marital property rights." Massachusetts law does not provide either spouse any property rights, but rather makes the assignment of property interests by the court completely discretionary or arbitrary. Mass. Gen. L. ch. 208, § 34 (providing that based on unguided consideration of a hodgepodge of factors the court "may" assign property of one ex-spouse to the other). Marital property "rights" would likely exist only in a community property jurisdiction. See Senate Report No. 98-575, pp. 18-9 (purpose of enactment of QDRO provisions is to resolve uncertainty whether ERISA preempts state law permitting attachment of benefits to meet "family support obligations" and "preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan") (emphasis added).

Third, the Order was not in fact issued "pursuant to a State domestic relations law," but rather contrary to same, which is precisely why the Order and judgment on which it is based are on appeal. Among other things, and without revealing details as the judgment involves personal and private matters and both it as well as all other papers in the action are impounded, the property provisions of the judgment are clearly unlawful in that:

    A. As a matter of Massachusetts law, "[a] judge shall disqualify himself . . . where . . . the judge has a personal bias or prejudice concerning a party," SJC Rule 3:09, Canon 3E(1)(a) (emphasis added), or even when "the judge's impartiality might reasonably be questioned," id., Canon 3E(1). Here the judge unlawfully refused to disqualify himself despite the facts, among others, that he (1) had previously disqualified my longtime counsel on purported ethical grounds after refusing to hear argument and refusing to read the memorandum, case law and affidavits that I submitted in opposition to her disqualification (even though he expressly promised to do so), (2) exhibited a hostile tone and body language in so ruling, (3) immediately proceeded to rule on other matters even though I expressly stated I wished to exercise my fundamental right to be represented by counsel before proceeding further, (4) shortly before trial was informed both that I had filed a previously confidential ethics complaint against him *and* that the Commission on Judicial Conduct had determined that the complaint alleged facts which, if true, "would constitute misconduct," and (5) then proceeded to enter a punitive judgment deliberately retaliating against me which flouted both the undisputed evidence and numerous requirements of Massachusetts law, some of which are set forth below.

    B. Under long-established Massachusetts law, married persons may contract with each other in the same manner as single persons, Mass. Gen.L. ch. 209, § 2 ("[a] married woman may make contracts, oral and written, sealed and unsealed, in the same manner as if she were sole, and may make such contracts with her husband"), and contracts may be created both by express words and by implication, including from conduct, e.g., Mass. Gen. L. ch. 106, § 1-201 ("the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing"); Moore v. Goddard, 147 Mass. 287, 292 (1888) ("agreement implied by the course of dealing"). Moreover, no state law, including Mass. L. ch. 208, § 34, authorizes the abrogation of

inter-spousal or any other private contracts, nor could any law constitutionally do so. The undisputed evidence at trial was that the parties had a contract about their financial affairs, both by express words and 21 years of conduct, yet the judge unlawfully abrogated that contract in the property provisions of the judgment.

C. Under ch. 208, § 34, marriage is a partnership that terminates once "both [parties] cease[] to hold themselves out to the community as a married couple, and there [is] no further marital relationship," and neither ex-spouse may be awarded any portion of the increase in the other's assets accumulating thereafter, Savides v. Savides, 400 Mass. 250, 251-2 (1987), including subsequent retirement plan contributions and appreciation, Daugherty v. Daugherty, 50 Masss. App. Ct. 738, 741 (2001); Kuban v. Kuban, 48 Mass. App. Ct. 387 (1999). Despite these legal requirements, the judge proceeded to award plaintiff property, including the proceeds of dividend reinvestments, new contributions from employment income and other accumulations in the Plan itself, acquired after the date on which, on the undisputed evidence, the marital partnership terminated.

D. As a matter of Massachusetts law, a trust providing that principal may be paid in trustees' "discretion" for specified purposes for a spouse's benefit creates a "present, enforceable, equitable right to use the trust property for [her] benefit" and must be included in marital property to be divided under ch. 208, § 34. Comins v. Comins, 33 Mass. App. Ct. 28, 30-1 (1992). Despite this rule, the judge excluded two trusts from marital property which made principal payable to plaintiff for specified purposes; moreover, the judge excluded one trust despite including another that had identical terms.

In addition to the above, the Order is also not a QDRO because it does not meet several other requirements for such an order. At the outset, it is important to note that the requirement of ERISA § 206 that an order "clearly specif[y]" various matters, 29 U.S.C. § 1056(d)(3)(C), be strictly interpreted, as the QDRO rules create a very limited exception to the general ERISA requirement that pension benefits may not be alienated for creditors or otherwise, id. §§ 1056(d)(1), (d)(3)(A), and to conclude otherwise would "do[] violence to the plain meaning of the statute," Hawkins v. Commissioner of Internal Revenue, 86 F. 3d 982, 992 (10th Cir. 1996) ("[n]owhere . . . has Congress implied that its factual requirements are optional; indeed, the language rather plainly states that a QDRO 'must clearly specify certain facts.' . . . To accept anything less . . . would contravene the Supreme Court's frequent admonition that courts must not read language out of a statute."). Further, for the reasons set forth above, both Foley Hoag and you—if you are a valid legal entity and properly authorized under the Plan and Act—must exercise any discretion concerning such issues for my exclusive benefit.

Against this background, the Order first fails to "clearly specif[y] . . . the amount . . . of the participant's benefits to be paid . . . to each such alternate payee, or the manner in which such amount . . . is to be determined," as required by § 206. 29 U.S.C. § 1056(d)(3)(C)(ii). Here the Order provides that plaintiff is "awarded . . . [a dollar amount] adjusted for any investment gains and losses . . . for the period between the date an account is established for the benefit of [plaintiff] and the date of distribution," Order ¶ II.A., and that the "Administrator is hereby

instructed to establish a separate account under the Plan in the name of [plaintiff] and in the amount of the benefit assigned to [plaintiff] pursuant to II.A," id. ¶ II.B.

These provisions woefully fail the "clearly specifies" test. For one thing, my benefits under the Plan are not held in cash but in varying numbers of shares of a variety of mutual funds. Yet the Order refers solely to a dollar amount, which fails to "clearly specif[y]" which shares from which funds are to be transferred. Indeed, your own purported qualification notice admits as much, stating that you have (unlawfully) established a separate account for plaintiff from my vested benefits by pro-rata alienation of my various individual mutual funds and that "[i]f the parties do not provide clarification with respect to the investment funds from which [plaintiff's account should be established [despite the fact that it already has been] within 30-days [sic] of the date of this Notice, the prorate [sic] segregation will remain in effect." Under the unambiguous terms of the Act, it is not up to the "parties" to "provide clarification" of the benefits to be transferred, nor do private parties even have power to "clarify" a court order; rather, the benefits to be conveyed must be "clearly specifie[d]" by the order.

Similarly, your counsel's own July 11, 2005 letter to plaintiff's counsel concedes that the court modified a draft order which plaintiff apparently proposed to the court (without serving me) "by omitting that portion of the Orders instructing NYLIM to separate the Participant's accounts on a pro rata basis," leading you to have "sought clarification [from the parties] to ensure that it has properly separated the funds in accordance with the Orders." Again, a valid QDRO does not require "clarification" by parties, nor can private parties clarify a court order.

Moreover, the provision that plaintiff is to be awarded a dollar amount adjusted by investment gains or losses between the date an account is established for plaintiff and the "date of distribution" does not "clearly specif[y]" anything. Since the Order directs the Plan to establish a separate account for plaintiff in the amount of the benefit assigned, it is not clear what is meant by the undefined term "date of distribution" as the dollar amount (if it had been properly specified in other than pure cash terms) would be "distributed" as soon as it was placed in plaintiff's account. Further, even if the "date of distribution" had been "clearly specifie[d]" as a date different from that of plaintiff's account funding it would be impossible to determine investment gains and losses between the two dates given the Order's failure to specify which shares of which funds were to be used in the calculation. In addition, the Order's failure to specify the dates of either plaintiff's account funding or "distribution" render the assigned benefit amount subject to caprice and hence not "clearly specifie[d]."[5]

In addition, the Order fails to "clearly specif[y] . . . the . . . period to which such order applies," i.e., the date for the benefit assignment, as also required by § 206. 29 U.S.C. § 1056(d)(3)(C)(iii). The Order contains no provision whatsoever as to when the benefit assignment is to be made.

---

[5] Under your own purported procedures, plaintiff's account would not be created and funded until after some party chose to provide you with the Order, a "reasonable period" passed for you to determine whether it constituted a QDRO and thirty more days passed without objection by either party to your determination; if there was an objection, the account could not be funded until the dispute was "resolve[d]."

Based on the foregoing, therefore, as well as all other applicable grounds, you are required by the fiduciary and definitional provisions of ERISA to find that the Order is <u>not</u> a QDRO.

Very truly yours,

David R. Geiger

cc:    Michael P. Boudett, Esq. (by hand)

## WHITE & INKER, P.C.
ATTORNEYS AT LAW

MONROE L. INKER
JOHN P. WHITE, JR.
FRANCES M. GIORDANO
PATRICIA M. BLACKBURN
CLAIRE C. TUTWILER
JULIE R. HESS-FITZGERALD
DIANE M. D'AMICO

ONE WASHINGTON MALL
BOSTON, MASSACHUSETTS 02108-2603

TELEPHONE 617-367-7700
TELEFAX 617-523-5085
E-MAIL: office@wialaw.com

August 19, 2005

*Via Facsimile and First-Class Mail*

Louis P. Georgantas, Esq.
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210

Re:    *David R. Geiger/Qualified Domestic Relations Orders*

Dear Attorney Georgantas:

A draft QDRO was mailed to you on January 6, with a copy to Mr. Geiger. I chose a form to draft the QDRO based upon a conversation with you. Over the course of the next 3 months, I reviewed the draft with you and Mr. Geiger. I wrote to you on January 31 (with a copy to Mr. Geiger), informing you that the judge was prepared to enter the QDRO when we were in court on January 28, and that he ordered us to find out from you why the QDRO forms required the signature of the parties, "as he does not want the QDROs to be bounced back once he signs them." We arrived at a draft which I understood you found acceptable, in the sense that it met all the requirements of a QDRO. The final version of the draft QDRO was delivered to Mr. Geiger in hand on March 16, with notice that Ms. Leeds would be presenting it to the court for approval and entry on March 29. Mr. Geiger filed written Objections to the entry of the QDRO. At the hearing on March 29, Mr. Geiger had a full and fair opportunity to make all of his objections to the QDRO known. Mr. Geiger, the judge, and I went over the draft QDRO line-by-line. Following this tortured review, the QDRO, with two changes initialed by the judge, was entered by the court as a final order. To the degree that Mr. Geiger interposed additional objections, they were rejected by the court. Mr. Geiger has predictably filed a notice of appeal from entry of the QDRO.

The court retained jurisdiction solely to amend or modify the QDRO "in order to establish or maintain its qualification as a Qualified Domestic Relations Order." In our view, the QDRO dated March 29, 2005 satisfies the requirements of 29 U.S.C. §1056(d) in each and every respect and is a valid and enforceable QDRO . If you, as the Plan administrator, see something that needs to be added or changed in order *to establish or maintain its qualification as a Qualified Domestic Relations Order*, please bring it to our attention and we will cooperate with you in seeking the necessary amendment or modification.



August 19, 2005
Louis P. Georgantas, Esq.
Page 2

Mr. Geiger's purpose is not to point out modifications needed to establish or maintain the QDRO's qualification as a Qualified Domestic Relations Order. His purpose is to obstruct and obfuscate by belatedly raising persnickety objections – in this case, to the process by which the QDRO was qualified rather than to its substance --, as has been his pattern throughout the past 4+ years. Mr. Geiger had ample notice in writing that I had given a draft QDRO to you for your review, and he had a fair and reasonable opportunity to air all of his objections, in writing or otherwise, to you and to me, as well as to the court. To the degree that Mr. Geiger's objections were rejected by the judge, Mr. Geiger has his appellate remedy. To the degree that he failed to raise his objections prior to the entry of the QDRO, he waived them. Unless the assignment to Ms. Leeds of Mr. Geiger's Keogh plan in the amount of $246,866, or the QDRO implementing that assignment, are overturned on appeal, or vacated pursuant to a proper Rule 60(b) motion, that there shall be a QDRO assigning to Ms. Leeds this benefit is res judicata as between Mr. Geiger and Ms. Leeds. Even if Mr. Geiger gets his wish and you find this QDRO not a qualified QDRO because of your own procedural missteps, and we have to have another QDRO entered because of your refusal to accept the QDRO already entered, the fact remains that there is a final judgment assigning Ms. Leeds a benefit under the Plan, and a qualified QDRO must enter effectuating that judgment, unless the judgment is vacated on appeal

Mr. Geiger's letter to you dated July 29, 2005, illustrates perfectly what Karen Leeds has had to endure for the past 4+ years, and continues to endure, as Mr. Geiger pursues his many frivolous issues. Mr. Geiger has treated this divorce as an intellectual playground. It is quite astonishing that a litigation attorney at Foley Hoag has time to write and file the voluminous pleadings that have been filed by Mr. Geiger over the course of the past 4 years in every appellate court of the Commonwealth in connection with this case. He has shielded his litigation tactics by means of a wholly unjustified impoundment order. We have moved to vacate that order in the hope that exposing his tactics to the light will cause him to exercise some restraint.

In order to keep Ms. Leeds' litigation expenses within something resembling reasonable bounds, we constantly have to exercise good judgment regarding which of Mr. Geiger's multitudinous issues and arguments require a response. Do not take our failure to address each and every one of Mr. Geiger's objections as assent or agreement to *anything* he says. Our chief concern is that the retirement funds lawfully assigned to Ms. Leeds in the parties' May 26, 2004 divorce have been preserved and protected on her behalf by Foley Hoag in an interest-bearing account.

Although in our view the question whether the QDRO entered on March 29 qualifies as a QDRO is res judicata as between Mr. Geiger and Ms. Leeds, we will address a number of Mr. Geiger's objections in the interests of assisting you in determining whether any modification or

August 19, 2005
Louis P. Georgantas, Esq.
Page 3

amendment is needed in order *to establish or maintain the order's qualification as a Qualified Domestic Relations Order.* Mr. Geiger fails to distinguish between a "domestic relations order," as defined in ERISA, which in this case means the divorce judgment itself (a judgment which relates to the provision of alimony or marital property rights to a spouse), and a "qualified domestic relations order," which is the QDRO. He erroneously applies ERISA's definition of a "domestic relations order" to the QDRO itself, in making his argument that the QDRO is not a QDRO.

Under Massachusetts law, the finality of a final judgment or order is not affected by an appeal, unless the judgment or order is stayed pending appeal, either by operation of law or by an order of stay. A filing of an appeal does not stay the operation of any aspect of a divorce judgment unless the court orders otherwise. Mass. R. Dom. Rel. P. 62(g). Mr. Geiger's motions for a stay of the judgment pending his appeal were denied both by the Probate judge and by the single justice of the Appeals Court. There is no stay of either the judgment or of the QDRO.

Mr. Geiger's claim that you can never have a QDRO in Massachusetts because Massachusetts does not provide spouses any property "rights" is yet another in a long line of sophistic arguments Ms. Leeds has had to contend with. Suffice it to say that a spouse in a divorce has a right to request a division of marital property, has a right to have the property division determined in accord with the mandatory section 34 factors, and has a right to a property division which is not an abuse of discretion. These are "marital property rights." If, as Mr. Geiger suggests, a divorce judge has completely unfettered discretion in the division of marital property and hence there is no right to an equitable division, what is he appealing?

The same can be said of Mr. Geiger's ludicrous contention that the QDRO was not issued pursuant to the domestic relations law "but rather contrary to same," because he has appealed from the divorce judgment on which it is based. The judge's power to award Ms. Leeds a portion of Mr. Geiger's retirement benefits and to enter the QDRO is grounded in the domestic relations law.

Appellate courts have a useful principle known as "harmless error." They do not reverse judgments because of a mathematical error involving an insignificant sum, nor will they set aside the QDRO in this case because the Plan is identified as "Foley Hoag LLP Keogh Plan" rather than "Foley Hoag LLP Retirement Plan." ERISA requires that a QDRO clearly specify the plan to which it applies. It does not require that the name of the plan be stated with exactitude. Is there anyone who has not known since early January what Plan is being addressed? Mr. Geiger had every opportunity to correct the name of the Plan stated in the draft QDRO, including at the hearing on March 29. The same can be said of your alleged failure to notify Mr. Geiger of your receipt of the draft QDRO early in January and of your alleged failure to notify him of the Plan's

August 19, 2005
Louis P. Georgantas, Esq.
Page 4

procedures for determining the qualified status of the QDRO. Mr. Geiger undeniably had actual notice that I sent the draft QDRO to you, had a copy of the draft QDRO at the same time you did, had without question either knowledge of the requirements for qualification of a QDRO or the ability to find those requirements, and had almost 3 months to make his objections known, followed by a full and fair hearing in court before the QDRO was entered as a qualified QDRO. The spirit if not the letter of your procedures and of the requirements of ERISA have been honored.

ERISA's requirement that the amount of Mr. Geiger's benefits to be paid to Ms. Leeds and the manner in which such amount is to be determined be clearly specified in the QDRO is satisfied. The QDRO awards Ms. Leeds two hundred forty-six thousand eight hundred and sixty-six dollars ($246,866) from Mr. Geiger's vested account under the Plan. As you correctly stated in your previous letter dated May 5, the QDRO required that this amount be liquidated from Mr. Geiger's vested account and deposited in cash in a separate account for Ms. Leeds. Once that separate account for Ms. Leeds' benefit was established, any gains or losses experienced by the account are incurred solely by her, until such time as the amount in the account is distributed to her.

I am not certain we agree with your interpretation of what the law requires you to do regarding the retirement benefits awarded to Ms. Leeds. Upon receipt of the draft QDRO, you were required to determine "within a reasonable period" whether it was a QDRO, which is my understanding of what you in fact did during the period January to March. 29 U.S.C. §1056(d)(3)(G)(i)(II). While you were making that determination, you were required to "separately account" for the amounts payable to Ms. Leeds [the "segregated amounts"] plus interest dating from the May 26, 2004 judgment that the benefit be paid to her. 29 U.S.C. §1056(d)(3)(H)(I). Once it was determined by a court of competent jurisdiction that the proposed QDRO should enter as a QDRO, as happened on March 29, 2005, you were required to "pay" the segregated amounts to Ms. Leeds.

Even though you have decided to embark on this review process after entry of the QDRO by the court, the QDRO directs you to "establish a separate account under the Plan in the name of the Alternate Payee" in the amount of $246,866. This is a clear direction that an account was to be established in Ms. Leeds' name as soon as practicable following entry of the QDRO on March 29, 2005. As stated above, ERISA required you to segregate the funds plus interest for Ms. Leeds' behalf upon receipt of the draft QDRO. A supplemental order entered contemporaneously with the QDRO directed that Ms. Leeds have a right to roll over her account. Because you found that order ambiguous and stated that you would not release any funds pending a clarification from the court, we obtained a second order dated June 1, 2005, clearly directing that Ms. Leeds shall be permitted to roll over her account to any other investment vehicle of her choice. Despite

August 19, 2005
Louis P. Georgantas, Esq.
Page 5

this order, Foley Hoag unlawfully persists in refusing to permit Ms. Leeds to roll over the
account and we have now learned persists in refusing to establish a separate account for her,
despite the clear command of the judgment.

In our view, Foley Hoag has been responsible since receipt of the draft QDRO on January
7, 2005, for segregating Ms. Leeds' benefit assigned to her by the May 26, 2004 divorce
judgment, and for preserving that benefit plus interest on her behalf. We will hold Foley Hoag
accountable, should Ms. Leeds suffer any loss because of Foley Hoag's failure to segregate Ms.
Leeds' funds plus interest in accordance with the law, pending your final determination that the
QDRO is indeed a QDRO.

Very truly yours,

*Fran Giordano (4n)*

Frances M. Giordano

FMG/th

cc:     Ms. Karen Leeds
        David R. Geiger, Esq.

# RUBIN AND RUDMAN LLP

### COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 330-7550 • EMAIL: FIRM@RUBINRUDMAN.COM

Frances M. Giordano
Direct Dial: (617) 330-7008
E-mail: fgiordano@rubinrudman.com

September 12, 2005

Mark S. Niziak, Esq.
Director, ERISA/Consulting Services
NYLIM Retirement Plan Services
690 Canton Street
Westwood, MA 02090

Re:   Foley Hoag LLP Money Purchase Pension Plan and
      Foley Hoag LLP Savings and Retirement Plan QDROs
      <u>for Karen Leeds and David R. Geiger (No. 99D-1578-DV1)</u>

Dear Attorney Niziak:

NYLIM mailed a copy of Model QDROs for the above retirement plans, as well as a copy of each Plan's Procedures, to Karen Leeds on December 23, with a copy to Mr. Geiger (**actual notice no. 1**). I drafted the QDROs based upon the model orders provided by New York Life. I wrote to Mr. Geiger on December 27 to confirm that he had received the Model Orders, and asked him to forward me his changes in time for the hearing, which was then scheduled for January 12 (**actual notice no. 2**). On January 14, 2005, a **Notice of Qualification of Domestic Relations Order** for each Plan was sent to myself and to Mr. Geiger by certified mail, return receipt requested (**actual notice no. 3**). Under the Plans' Procedures, Mr. Geiger had 30 days from receipt of the Notices to dispute the determination by written objection. The QDROs were presented to the judge at a hearing on January 28. After the hearing, attended by Mr. Geiger, where the QDROs were discussed with the judge (**actual notice no. 4**), I wrote to Mr. Georgantas on January 31 (with a copy to Mr. Geiger) (**actual notice no. 5**), informing him that the judge was prepared to enter the QDROs when we were in court on January 28, and that he ordered us to find out from the plan administrators why the QDRO forms required the signature of the parties, "as he does not want the QDROs to be bounced back once he signs them." The question whether a separate dollar amount was needed for each Plan also came up in court. I delivered a final version of the QDROs to Mr. Geiger in hand on March 16, with notice that Ms. Leeds would be presenting the QDROs to the court for approval and entry on March 29 (**actual notice no. 6**). On March 21, in response to my inquiry, Mr. Geiger provided me the dollar amount for each Plan and confirmed that the amounts were still available, and I sent NYLIM, with a copy to Mr. Geiger (**actual notice no. 7**), the final version of the QDROs, which were identical to the QDROs previously found qualified, with the exception that the amount of benefit

EXHIBIT 7

RUBIN AND RUDMAN LLP

Mark S. Niziak, Esq.
September 12, 2005
Page 2

assigned to Ms. Leeds was changed from 100% of each account to the specific dollar amount for each Plan provided to me by Mr. Geiger. Mr. Geiger filed written Objections to the entry of the QDROs with the court. At the hearing on March 29, Mr. Geiger had a full and fair opportunity to make all of his objections to the QDROs known (**actual notice no. 8**). Mr. Geiger, the judge, and I went over the draft QDROs line-by-line. Following this tortured review, the QDROs, with two changes requested by Mr. Geiger and initialed by the judge, were entered by the court as final orders, along with the Supplemental Order of that date. To the degree that Mr. Geiger interposed additional objections, they were rejected by the court. Mr. Geiger has predictably filed a notice of appeal from entry of the QDROs.

The court retained jurisdiction solely to amend or modify each QDRO "in order to establish or maintain its qualification as a Qualified Domestic Relations Order." In our view, the QDROs dated March 29, 2005 satisfy the requirements of 29 U.S.C. §1056(d) in each and every respect and are valid and enforceable QDROs . If you, as the Plan administrator, see something that needs to be added or changed to either of the QDROs in order *to establish or maintain its qualification as a Qualified Domestic Relations Order*, please bring it to our attention and we will cooperate with you in seeking the necessary amendment or modification.

The January 14 **Notices of Qualification** provided that, if no timely request for review was received by the Plan Administrator, then upon receipt of executed copies of QDROs, final qualification of the Orders would be authorized, and an account would be established for the Alternate Payee. I sent the QDROs entered by the court to you by overnight delivery on March 30. Rather than authorize final qualification, on April 1, NYLIM mailed to me and to Mr. Geiger by certified mail, return receipt requested, **Amended Notices of Qualification of Domestic Relations Order** for each of the Plans, reflecting the change of the benefit assigned to the specific dollar amounts (**actual notice no. 9**). Once again Mr. Geiger was given 30 days to request a review. He once again did nothing. On May 5, NYLIM wrote to inform me, with a copy to Mr. Geiger by certified mail, return receipt requested (**actual notice no. 10**), that accounts for the benefit of Ms. Leeds had been established under the Plans. Although the Supplemental Order dated March 29, 2005, stated that Ms. Leeds "shall not be restrained" from investing or "rolling over" her benefits in the Plans, NYLIM took the indefensible position in its May 5th letter to me that Ms. Leeds could not "rollover" her accounts "until the Court authorizes the change in account status." Because of the position taken by NYLIM, I had to return to court for an Order dated June 1, 2005, which reiterated that Ms. Leeds shall have leave to roll over her share of the accounts (**actual notice no. 11**). On June 13, NYLIM wrote to inform me, with a copy to Mr. Geiger by certified mail, return receipt requested (**actual notice no. 12**), that, in response to this Order entered by the court, Ms. Leeds' accounts had been unfrozen.

Although NYLIM had already issued Notices of Qualification and Amended Notices of Qualification, and although the QDROs were entered by the court with the reasonable understanding that the QDROs had been found qualified by NYLIM, on July 8 NYLIM issued

RUBIN AND RUDMAN LLP

Mark S. Niziak, Esq.
September 12, 2005
Page 3

**Final Notices of Qualification of Domestic Relations Order** and for the third time gave Mr. Geiger 30 days to request a review. You justified this by mischaracterizing the Order dated June 1 as a modification of the QDROs entered by the court on March 29, and previously found qualified by NYLIM on April 1, even though in fact the June 1 Order simply made abundantly clear what was already clearly stated in the March 29 Supplemental Order. Nothing in your Procedures or in ERISA authorizes let alone requires a plan administrator who issues a notice of qualification after a court has entered a QDRO to follow this notice with a second "final" notice of qualification. Nor do your Procedures or ERISA authorize you to grant Mr. Geiger yet another opportunity to request a review at this late date. Because you have chosen to kowtow to Mr. Geiger's dilatory tactics, you have wrongfully once again frozen Ms. Leeds' accounts, and further injured her by putting her to the expense of unnecessarily enduring a "review" of your "final" determination that the QDROs already entered as the judgment of a court indeed qualify.

Mr. Geiger's purpose is to obstruct and obfuscate by belatedly raising persnickety objections – in this case, to the process by which the QDROs were qualified rather than to substance --, as has been his pattern throughout the past 4+ years. Mr. Geiger had ample notice in writing that the QDROs were found qualified by NYLIM, both before they were presented to the court and after they had been entered by the court, and he had a fair and reasonable opportunity to air all of his objections, in writing or otherwise, to NYLIM and to me, as well as to the court. To the degree that Mr. Geiger's objections were rejected by the judge, Mr. Geiger has his appellate remedy. To the degree that he failed to raise his objections prior to the entry of the QDROs, he waived them. Unless the assignment to Ms. Leeds of Mr. Geiger's Foley Hoag Money Purchase Pension Plan and Foley Hoag LLP Savings and Retirement Plan in the total amount of $345,912, or the QDROs implementing that assignment, are overturned on appeal, or vacated pursuant to a proper Rule 60(b) motion, that there shall be QDROs assigning to Ms. Leeds these benefits is *res judicata* as between Mr. Geiger and Ms. Leeds. Even if Mr. Geiger were to get his wish and you were to find these QDROs not qualified because of procedural missteps, and we have to have the QDROs already entered reentered, the fact remains that there is a final judgment assigning Ms. Leeds benefits under the Plans, and qualified QDROs must enter effectuating that judgment, unless the judgment is vacated on appeal

Although in our view the question whether the QDROs entered on March 29 qualify as QDROs is res judicata as between Mr. Geiger and Ms. Leeds, we will address a number of Mr. Geiger's objections in the interests of assisting you in determining whether any modification or amendment is needed in order *to establish or maintain either order's qualification as a Qualified Domestic Relations Order*. Under Massachusetts law, the finality of a final judgment or order is not affected by an appeal, unless the judgment or order is stayed pending appeal, either by operation of law or by an order of stay. A filing of an appeal does not stay the operation of any aspect of a divorce judgment unless the court orders otherwise. Mass. R. Dom. Rel. P. 62(g). Mr. Geiger's motions for a stay of the judgment pending his appeal were denied both by the

RUBIN AND RUDMAN LLP

Mark S. Niziak, Esq.
September 12, 2005
Page 4

Probate judge and by the single justice of the Appeals Court. There is no stay of either the judgment or of the QDROs.

Mr. Geiger's claim that you can never have a QDRO in Massachusetts because Massachusetts does not provide spouses any property "rights" is yet another in a long line of sophistic arguments Ms. Leeds has had to contend with. Suffice it to say that a spouse in a divorce has a right to request a division of marital property, has a right to have the property division determined in accord with the mandatory section 34 factors, and has a right to a property division which is not an abuse of discretion. These are "marital property rights." If, as Mr. Geiger suggests, a divorce judge has completely unfettered discretion in the division of marital property and hence there is no right to an equitable division, what is he appealing?

The same can be said of Mr. Geiger's ludicrous contention that the QDROs were not issued pursuant to the domestic relations law "but rather contrary to same," because he has appealed from the divorce judgment on which it is based. The judge's power to award Ms. Leeds a portion of Mr. Geiger's retirement benefits and to enter the QDROs is grounded in the domestic relations law. Enough said.

Mr. Geiger's view of when the benefits assigned to Ms. Leeds are required by ERISA to be segregated in an account for Ms. Leeds' benefit is mistaken. Upon receipt of the draft QDROs, you were required to determine "within a reasonable period" whether they qualified as QDROs, which is my understanding of what you in fact did in your January 14 Notice of Qualification  See U.S.C. §1056(d)(3)(G)(i)(II). While you were making that determination, you were required to "separately account" for the amounts payable to Ms. Leeds [the "segregated amounts"] plus interest dating from the May 26, 2004 judgment that the benefit be paid to her. See, 29 U.S.C. §1056(d)(3)(H)(I). Once it was determined by a court of competent jurisdiction (nothing in ERISA requires that this be a federal court) that the proposed QDROs should enter as QDROs, as happened on March 29, 2005, you were required to "pay" the segregated amounts to Ms. Leeds. The QDROs directed you forthwith to "establish a separate account under the Plan in the name of the Alternate Payee in the amount of the benefit assigned to the Alternate Payee." Accordingly, accounts in the name of Ms. Leeds under the Money Purchase Pension Plan and the Savings and Retirement Plan were established as of April 1.

ERISA requires that a QDRO clearly specify "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined." See, U.S.C. §1056(d)(3)(C)(ii). That requirement is satisfied by the QDROs in this case. The QDROs award Ms. Leeds two hundred sixty-three thousand four hundred and fifteen dollars ($263,415) from Mr. Geiger's vested account under the Savings and Retirement Plan and eighty-two thousand four hundred ninety-seven dollars ($82,497) from Mr. Geiger's vested account under the Money Purchase Pension Plan. Each QDRO states the precise amount of Mr. Geiger's benefits to be paid by each Plan to

RUBIN AND RUDMAN LLP

Mark S. Niziak, Esq.
September 12, 2005
Page 5

Ms. Leeds, thereby eliminating any need for the alternative requirement that the plan state the manner in which such amount is to be determined. ERISA requires "reasonable" procedures for the administration of distributions under QDROs. *See.* U.S.C. §1056(d)(3)(G)(ii). Ms. Leeds makes no objection to the manner in which you have segregated the amounts assigned to her from Mr. Geiger's vested accounts, in accord with the Plans' administrative procedures.

Mr. Geiger's letter to you dated August 12, 2005, illustrates perfectly what Karen Leeds has had to endure for the past 4+ years, and continues to endure, as Mr. Geiger pursues his many frivolous issues. In order to keep Ms. Leeds' litigation expenses within something resembling reasonable bounds, we constantly have to exercise good judgment regarding which of Mr. Geiger's multitudinous issues and arguments require a response. Do not take our failure to address each and every one of Mr. Geiger's objections as assent or agreement to *anything* he says. Our chief concern is that the retirement benefits lawfully assigned to Ms. Leeds in the parties' May 26, 2004 divorce have been preserved and protected, and continue to be preserved and protected, on her behalf by New York Life.

Respectfully submitted,

*Frances M. Giordano (th)*

Frances M. Giordano

FMG/th

cc: Ms. Karen Leeds
David Geiger, Esq.



# FOLEY
# HOAG LLP
ATTORNEYS AT LAW



James J. Dillon
Boston Office
617.832.1109
jdillon@foleyhoag.com

September 28, 2005

David R. Geiger, Esq.

Frances M. Giordano, Esq.
Rubin & Rudman LLP
50 Rowes Wharf
Boston, MA 02110

Re:    Foley Hoag Retirement Plans

Dear Mr. Geiger and Ms. Giordano:

I write to inform you of developments involving accounts in the three Foley Hoag retirement plans that are the subject of Orders of the Massachusetts Probate and Family Court.

As you know, Foley Hoag LLP as Plan Administrator (hereinafter "the firm") determined on September 16, 2005 that the March 29, 2005 Orders of the Probate and Family Court constitute Qualified Domestic Relations Orders (QDROs). However, Mr. Geiger subsequently filed a lawsuit in the United States District Court for the District of Massachusetts against the firm that challenges that determination. By terms of the ERISA statute, the firm, as administrator of the plans, is prohibited from completing unrestricted transfer of the funds to Ms. Leeds while the issue of the QDRO status is before a court of competent jurisdiction. The U.S. District Court is such a court. As administrator of the plans, the firm is responsible for separately accounting for amounts that would have been payable to Ms. Leeds as the alternative payee. See ERISA Section 206(d)(3)(H)(i) and Internal Revenue Code Section 414(p). Because of these provisions, the firm cannot comply fully with the March 29, 2005 Orders of the Probate and Family Court.

Accordingly, with regard to both the Savings and Retirement Plan and the Money Purchase Plan, New York Life Investment Management (NYLIM), acting pursuant to the March 29, 2005 Orders, opened accounts within the plans in the name of Karen Leeds as Alternate Payee on May 5, 2005 and funded them in the amount of $263,415 and $82,497, respectively, withdrawing the funds on a pro rata basis from the accounts in Mr. Geiger's name. Since that time, the funds have remained invested pursuant to Mr. Geiger's investment elections. Thus, the total amount in these two plans under Mr. Geiger's name and Ms. Leeds' name is the same as the total which would have been in Mr. Geiger's name absent the QDROs. The firm understands that this arrangement is consistent with the directive of ERISA that we "separately account" for funds that would have been payable to Ms. Leeds.

B3100792.1



EXHIBIT 8

Mr. Geiger and Ms. Giordano
September 28, 2005
Page 2

With regard to the Foley Hoag Retirement Plan (a/k/a the Keough Plan), the firm directed our agent on September 16, 2005 to withdraw $246,866 from Mr. Geiger's account, taken pro rata from Mr. Geiger's several investments within the Keough Plan. An account was established within that plan in the name of Karen Leeds as Alternate Payee. Because of the different nature of this plan, the investments in Mr. Geiger's name were sold, to the amount of $246,866, and that sum has now been placed in a money market interest rate account in the name of Karen Leeds as Alternate Payee.

While Mr. Geiger's federal action is pending, the firm understands that it is prohibited from allowing the accounts in Ms. Leeds' name from being withdrawn from the Plan in any fashion, including through a "roll over." The firm has received outside legal advice on this issue.

If you believe that the current investment elections should be changed, we request that you confer and attempt to agree on instructions to be given to the firm in this regard. Alternatively, you may seek guidance from the federal court on this issue (which we understand to be one of federal law), or the firm may do so on its own initiative. Reasonable options would seem to include choosing a conservative fund focused on preservation of capital or escrowing the funds with the U.S. District Court (although the funds may not earn interest in such status and you would be responsible for determining whether this course preserves the tax-favored status of the account).

We anticipate retaining outside counsel to represent the firm in the federal action. Once we do so, we will ask that you direct your communications about the suit to our counsel.

Sincerely yours,

James J. Dillon

JJD/jlf

B3100792.1



COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT
NORFOLK DIVISION

FIRST JUSTICE
DAVID H. KOPELMAN

ASSOCIATE JUSTICES
CHRISTINA L. HARMS
ROBERT W. LANGLOIS
PAULA M. CAREY
ANGELA ORDOREZ

35 SHAWMUT ROAD
CANTON, MA 02021
TEL. (781) 830-1200
FAX (781) 830-4310
WWW.NCPFC.ORG

REGISTER &
CLERK MAGISTRATE
PATRICK W. McDERMOTT

ASSISTANT REGISTERS
JOHN B. JENNEY, FIRST
CLARE GAMBERONI
KATHRYN D. SILVERIA
LEE PETERSON
RICHARD P. SCHMIDT

April 14, 2005

Mr. David R. Geiger

Frances M. Giordano, Esquire
White Inker Aronson, PC
One Washington Mall
Boston, MA 02108

## NOTICE OF NONCONFORMING APPEAL

RE:   Karen Leeds vs. David R. Geiger

Docket Number:  99D1578-DV1

Dear Mr. Geiger and Attorney Giordano:

The appeal filed in this office on April 1, 2005, appears not to conform to the Massachusetts Rules of Appellate Procedure ("MRAP") which require the following information. The part emphasized in bold print applies directly to the aforesaid appeal:

In a civil case, unless otherwise provided by statute, the notice of appeal required by Rule 3 **shall be filed with the clerk of the lower court within thirty (30) days of the date of the entry of the judgment appealed from** ....

As such, the Notice of Appeal filed April 1, 2005, has not been filed in a timely manner as it appears that there has not been any ruling, to date.  This Notice accompanies the Notice of Receipt of Appeal and the Notice of Filing Appeal.

Please direct all further matters concerning this case to the attention of the Appeals Clerk.

Sincerely,

APPEALS CLERK

EXHIBIT 9

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

**Norfolk Division**                                   **Docket No.** 99D1578-DV1


**Karen Leeds,** Plaintiff

**v.**

**David R. Geiger**, Defendant


## SUPPLEMENTAL FINDINGS
## OF FACT


The within matter came before the Court on August 25, 2004. for an evidentiary hearing on the "Plaintiff Motion for Allowance Toward Her Attorney's Fees & Costs" The Court heard from two (2) witnesses and three (3) exhibits were admitted into evidence. Following the hearing the Court, which has also review the parties' post-hearing memoranda, based upon the evidence presented, including the evidence presented at the original trial, together with all reasonable inferences which could be drawn therefrom, enters the Supplemental Findings of Fact noted below as well as the additional terms noted as its accompanying Further Amended Judgment of Divorce Nisi. The Court has also appended to the further amended judgment an additional Rationale addressing the issue addressed in the accompanying Further Amended Judgment of Divorce Nisi.

1. According to the parties' financial statements submitted at trial (Trial Exhibits no. "1a." and "2.a."), as of the commencement of trial (3/29/04), the wife had incurred $206,286 in counsel fees; the husband had incurred $116,631 in counsel fees for various attorneys during the same approximate (to 2/29/04) period. There was no suggestion that the charges of plaintiff's counsel were unreasonable or that the services so rendered were unnecessary. The Court specifically finds such services to have been necessary and the attending charges and expenses to be fair and reasonable.

EXHIBIT //

2. At the conclusion of the August 25, 2004 hearing, Geiger's counsel (P. Kane, Esq.) sought time to provide post-hearing submissions regarding the issue of counsel fees. He asked for "a week" to which his client instantly responded (from counsel table, not the witness stand) that it (one week) was not enough time. The Court then indicated that submissions would be due in sixteen days.

3. During the course of this protracted litigation, the husband frequently represented himself. As was apparent as indicated by his response set forth in the preceeding finding, even when he was represented by counsel, he frequently prepared and/or assisted in the preparation of pleadings, memoranda and other submissions, including appellate filings.

4. During the course of this litigation, the husband, prior to the commencement of trial, filed six interlocutory appeals to a single justice of the Appeals Court, three petitions before to a full panel of the Appeals Court and four proceedings in the Supreme Judicial Court. None of the proceedings resulted in his obtaining the relief which he sought. In one matter, he was assessed fees and costs of approximately $8,900, which he paid from marital assets following the filing of, but prior to the actual hearing on, a contempt proceeding.

5. Some of the issues which were subject of the defendant's appeals were:

-his objection to the Court's incorporation into a temporary order of a signed agreement of the parties (which agreement stated in relevant part that "[t]he parties agree that Robin Deutsch shall be appointed GAL to investigate and report to the court with recommendations concerning a parenting plan in the best interest of the children. Dr. Deutsch shall be authorized to release copies of her report directly to the parties' respective counsel. The cost of the GAL services shall be paid from marital assets, specifically the husband's Fidelity account.";

-his objections on more than one occasion to the summer parenting plan ordered by the Court;

-his objection to be denied a copy of the GAL report which was in the possession of his attorney (see above) and to which he had complete access; and,

-his objection to the Court's allowance of his
attorney's motion to withdraw, which action (the attorney's
withdrawal) was, in the opinion of both his counsel and the
Court, ethically mandated.

6. As referenced above, the defendant, regardless of whether he
was *pro se* or represented by counsel, undertook to perform
considerable legal activity which necessitated a response on the part
of the plaintiff. The defendant, a skilled litigator who heads the civil
litigation division of a large Boston law firm, thus caused the plaintiff
to incur significant legal fees whereas his costs for such were either
modest, minimal or, in many instances non-existent.

7. The plaintiff seeks an award of counsel fees in the amount of
$100,000 which, she asserts, is approximately one-third of the total of
the fees and expenses which she inccurred, excluding those fees which
she was awarded by the Appeals Court.

8. The defendant's assertion that an award of fees is
inappropriate because "...she caused virtually all the appellate
litigation...."[1] (underlining in original) is not supported by either the
evidence or the results of his various appeals.

9. The Court finds that the defendant's activity, much of which
was accomplished on his own, in this case resulted in unnecessary and
costly activity on the part of the plaintiff's counsel. Moreover, his
actions caused numerous delays in the conduct of the case. (See
"Procedural History".)

10. The Court further finds that an award of $45,000 to the
plaintiff to be, in view of the circumstances of this case, fair,
reasonable and conservative. See: G.L. c. 208, § 38; see also <u>Hayden</u>
v. <u>Hayden</u> 326 Mass. 587 (1950), <u>Kennedy</u> v. <u>Kennedy</u> 40 Mass 272
(1987), <u>Ross</u> v. <u>Ross</u> 385 Mass. 30 (1982), <u>Kane</u> v. <u>Kane</u> 13
Mass.App.Ct. 557 (1982), Cooper v. Cooper 62 Mass.App.Ct. 130
(2004). Although the defendant has the ability to pay the amount of
the award, rather than require that it be paid forthwith, under the

---

[1] "Defendant's Post-Hearing Memorandum in Opposition to Plaintiff's Motion for
Allowance of Counsel Fees" p.2, line 9.

terms of the further amended judgment, payment is not mandated until after he could be expected to receive, as has been the case in past years, a significant bonus in early 2005.

October 15, 2004
**Date**

**Robert W. Langlois, Justice**
Norfolk Probate and Family Court

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

NO. 05-CA-11893-RWZ

|  |  |
|---|---|
| DAVID R. GEIGER,<br>                Plaintiff,<br><br>   vs.<br><br>FOLEY HOAG LLP RETIREMENT<br>PLAN, FOLEY HOAG LLP SAVINGS<br>AND RETIREMENT PLAN, FOLEY<br>HOAG LLP MONEY PURCHASE<br>PENSION PLAN and FOLEY HOAG LLP<br>as administrator of each of the foregoing<br>plans,<br>                Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF REASONS WHY
## INTERVENER PLAINTIFF'S MOTION
## FOR ATTORNEY'S FEES PURSUANT
## TO ERISA SHOULD BE ALLOWED

A five factor standard is applied in considering a motion for an award of attorney's fees under ERISA. Those standards are "(1) the degree of bad faith or culpability of the losing party; (2) the ability of such party to personally satisfy an award of fees; (3) whether such award would deter other persons acting under similar circumstances; (4) the amount of benefit to the action as conferred on the members of the pension plan; and (5) the relative merits of the parties' positions." *Gray v. New England Telephone and Telegraph Co.,* 792 F.2d 251, 257-258 (lst Cir. 1986). These factors are intended as flexible guidelines; "not every factor must be considered in each case [cite omitted], and. . . no one of them should be dispositive [cite omitted]." *Id.* at 258. The "[a]bility to satisfy an award, deterrence, and benefit conferred by the parties' positions"

have been identified as factors favoring a prevailing plaintiff more strongly than a prevailing

defendant on the assumption that the prevailing plaintiff rather than a prevailing defendant is a

plan beneficiary and participant. *Id.* at 258-259. This accords with ERISA's principal purpose to

protect the legitimate interests of plan beneficiaries and participants. *Cottrill v. Sparrow,*

*Johnson & Ursillo, Inc.*, 100 F.3d 220, 226 (1st Cir. 1996). In this case, Plaintiff David Geiger

["Geiger"], who is a plan beneficiary, sued his retirement plans and the plan administrator for the

purpose of destroying the interest in his retirement plans assigned by a Massachusetts court to

Intervener Plaintiff Karen Leeds ["Leeds"], who is also a plan beneficiary. As both Geiger and

Leeds are plan beneficiaries, the rule that certain factors favor a prevailing plaintiff more

strongly than a prevailing defendant would appear to have no application here.

**FACTOR 1: GEIGER'S BAD FAITH.** What could this lawsuit reasonably hope to

accomplish? The crux of Geiger's objections to the QDROs is that the state court assigned

Leeds an interest in his retirement accounts. Geiger placed that assignment in issue in his state

court appeal from the divorce judgment; he did not place it in issue in this proceeding. Although

the outcome of Geiger's state court appeal was not known when he began this lawsuit, the relief

Geiger sought in this action was either unnecessary or foredoomed, depending on the outcome of

his state court appeal. If the state appellate court had overturned the assignment to Leeds of an

interest in Geiger's retirement accounts, the state court would have vacated the QDROs as a

matter of course. This lawsuit was not necessary to accomplish that. If on the other hand the

state court were to affirm the assignment (as in fact it did), there could be no question that Leeds

was entitled to have QDROS entered in order to carry out that assignment. If there were

deficiencies in the QDROs entered by the state court, Geiger had ample opportunity to remedy

those deficiencies in state court.  Geiger himself argued, in opposing Leeds' motion to intervene, that the effect of success in this lawsuit would be that Leeds would have to obtain "fully ERISA compliant QDROs" in state court.[1]

Geiger's bad faith in bringing this action is properly evaluated in light of his conduct in the related state court proceedings.  As this court correctly observed in its Memorandum of Decision dismissing this action, Geiger deliberately chose not to raise in the parties' divorce proceeding the issue of the qualified status of the QDROs, even though there was extensive correspondence concerning the draft Orders, Geiger had ample opportunity to comment upon the drafts during the months preceding the March 29, 2005 court hearing where the court adjudged the Orders to be QDROs, and Geiger filed a memorandum and appeared at the hearing to argue in opposition to the issuance of QDROs.[2]  Geiger remained on the sidelines for four (4) months while Leeds' attorney worked out acceptable QDROs with Foley Hoag and its designee for presentation to the court for its approval.  It was only after the court approved the QDROS that Geiger for the first time raised questions regarding the process of the Plan Administrator, Foley Hoag, for qualification of the QDROs.[3]   *See*, letter dated March 31, 2005, Geiger to NYLIM

---

[1]Geiger claimed Leeds would not be prejudiced by a denial of a right to intervene in this action, because, "in the worst-case scenario for her . . . , she will need only to obtain new, and this time fully ERISA-compliant, state court assignment orders to obtain her desired result."  *See*, Plaintiff's Opposition To Motion To Intervene at 11.

[2]The draft Orders were first presented to the Probate Court on January 28, 2005.  The judge raised a question about the draft QDROs and made clear that he wanted the orders in a form acceptable to the Plan Administrator before he signed them.  Following the hearing the wife's attorney again sent a draft QDRO to Foley Hoag, the Plan Administrator (and Geiger's law firm), with a copy to Geiger, and asked for a written response.  *See*, letter dated January 31, 2005, Attorney Giordano to Attorney Georgantas, attached as Ex. 1.

[3]Two days after the Probate Court approved the QDROs, Geiger wrote to the Plan Administrator's designee of two of his retirement plans, New York Life Investment Management LLC ["New York Life"] , claiming that he had never received any notice that New York Life

Retirement Plan Services, attached as Ex. 3.   Geiger then embarked on a wholly wasteful exercise whereby he called upon Foley Hoag and its designee to requalify the Orders already found qualified by the court.[4]   Geiger made written objections to Foley Hoag's determination of qualification for the first time on July 29, 2005, and made written objections to New York Life's Notice of Qualification of the QDROs for the first time on August 12, 2005.  *See,* letters attached as Exs. 4 and 5.  Leeds incurred significant attorney's fees responding to Geiger's objections. *See,* letters attached as Exs. 6, and 7.  Finally, eleven (11) months after Leeds began the work to draft QDROs satisfactory to the Plan Administrator and almost six (6) months after the Probate Court found the QDROs qualified, the Plan Administrator and its designee issued Final Notices of Qualification.  Geiger immediately commenced this lawsuit.

Geiger named as defendants his three retirement plans and the Plan Administrator. Although Leeds' interest in the outcome of the proceeding was painfully obvious,[5] Geiger did not name Leeds as a party and gave Leeds no notice that he had commenced this proceeding, thereby forcing Leeds to bring a motion to intervene.[6]  Although Leeds clearly had a right to

---

was considering approval of the QDROs.  Geiger was copied on all correspondence between Leeds' counsel and Foley Hoag and New York Life.  *See,* correspondence attached as Ex. 2. New York Life's Notices of Qualification of Domestic Relations Orders as to the two plans it administered was mailed to Geiger on January 14, 2005, certified mail, return receipt requested. *See,* Notices included in Ex. 2.

[4]A Plan Administrator is bound by a court's determination that an order is qualified as a QDRO.  *See,* cases cited in Leeds' Memorandum filed in support of her motion to dismiss at 14. As one court wisely observed, "ERISA's allocation of functions . . . is eminently sensible. . . [T]he spectacle of administrators second-guessing state judge's decisions under state law would be repellent." *Blue v. UAL Corporation,* 160 F.3d 383, 386 (7th Cir. 1998).

[5]Geiger's complaint sought a  permanent injunction ordering the plans and the Plan Administrator to restore to him the interest in his plans transferred to Leeds pursuant to the parties' divorce judgment and to refrain in the future from transferring or assigning any interest to Leeds.

[6]Leeds learned of this proceeding when the Plan Administrator wrote to inform her that,

intervene pursuant to Rule 24(a),[7] Geiger opposed her motion.  He complained that Leeds'

intervention would place an immense additional burden on him because, in order to respond to

additional court filings, he would be forced to "default[ ] on his responsibilities to his children,

fiancée and job for a considerable period of time," because he is a "time-stressed and insolvent

single parent who is proceeding pro se."  As is discussed *infra,* Geiger's claim that he is

representing himself because he cannot afford representation is completely unfounded.

After commencing this action, Geiger delayed service of process on the Defendants for

four months.  In the interim, Geiger filed a motion for a preliminary injunction, asking that the

Defendants be ordered to fully restore to his retirement plans any benefits already assigned to

Leeds.  In support of his motion, Geiger falsely told this court that the Defendants "do not . . .

disagree with or object to the relief requested in my Motion."  *See*, Defendants' Motion For

Entry of Order, ¶8; Affidavit of David R. Geiger, ¶4, filed in support of his Motion For

Preliminary Injunction.  The Defendants, who were not even served with process until January

13, 2006, were unaware that the court entered an order dated October 21, 2005, granting the

husband's motion "without opposition" until it was brought to their attention by Leeds in

December, 2005.[8]

---

because of Geiger's pending lawsuit, it was prohibited by law from completing unrestricted
transfer of retirement funds to her in accord with the QDROs entered by the Massachusetts court.
*See,* letter dated September 28, 2005, Foley Hoag to Geiger and Attorney Giordano, attached as
Ex. 8.

[7]There can be no doubt that Leeds claims an interest relating to the property which was
the subject of Geiger's action and "is so situated that the disposition of the action may as a
practical matter impair or impede [her] ability to protect that interest, unless the applicant's
interest is adequately represented by existing parties."

[8]Geiger never gave Leeds notice or copies of any pleadings filed by him in this case, until
Leeds moved to intervene.  Leeds followed activity in the case by periodically checking entries
on the public docket.

733217_1

Geiger claimed he needed a preliminary injunction because Leeds' accounts were about to be "unfrozen," subjecting him to investment losses and dissipation. *See,* Plaintiff's Memorandum In Support of Motion For Preliminary Injunction. Geiger never made this court aware that, upon the filing of this lawsuit, Foley Hoag immediately notified the parties that the funds in Leeds' retirement accounts would remain frozen, including prohibiting a roll over of the funds, while this action remained pending.[9] *See,* Ex. 8.

Geiger also misled this court by asserting that the QDROs are presently on appeal and hence not final. *See,* Amended Complaint, ¶29a; Plaintiff's Memorandum in Support of Motion For Preliminary Injunction at 2. In opposing Leeds' motion to dismiss, Geiger claimed that he had filed a timely appeal, and that proceedings on his appeal "are currently in abeyance." *See,* Plaintiff's Opposition To Motion To Dismiss and Request For Sanctions at 2 n. 3. The truth is that Geiger was notified by the Probate Court's appeals clerk that his notice of appeal had not been filed in a timely manner, because the QDROs had not yet been entered on the docket when he filed it. *See,* Notice of Nonconforming Appeal, attached as Ex. 9. Although Geiger easily could have again filed a notice of appeal, once the QDROs were entered on the docket, he chose not to. In fact, to this day he has never done anything since filing his notice of appeal prematurely to perfect his appeal from the QDROs.

The order granting Geiger's motion for a preliminary injunction required him to file a proposed order as agreed to by the defendants and to file a bond. Geiger never filed a bond and

---

[9]Leeds had complaints for contempt pending against Foley Hoag and New York Life for their failure to comply with the state court orders directing that Leeds be permitted to roll over the funds in her accounts. In response to the September 28 letter from Foley Hoag, Leeds notified Foley Hoag that, although she disagreed with Foley Hoag's view that ERISA required it to freeze her accounts, she was placing prosecution of her complaints for contempt on hold.

never conferred with the defendants regarding a proposed order. Instead, when, on April 5, 2006, the defendants appeared in the case and filed a Motion For Entry of Order, in essence continuing the freeze of Leeds' retirement accounts, Geiger interposed a frivolous opposition to Foley Hoag's motion, claiming a high likelihood of success on the merits because Foley Hoag's determination that the Orders were QDROs violated ERISA in various respects.

If Geiger in good faith believed that the QDROs entered by the state court in some manner failed to meet ERISA's requirements, he had a state court remedy ready at hand. The Massachusetts Probate Court expressly retained jurisdiction to modify each QDRO, if necessary to "establish or maintain its qualification as a Qualified Domestic Relations Order." *See*, Exs. A, B and C, attached to Geiger's Amended Complaint. To this day, Geiger has never asked the Massachusetts court to modify its QDROs, because his purpose was never to obtain compliance with ERISA.[10] His purpose was always to obstruct and delay Leeds' enjoyment of the retirement benefits awarded to her, and to burden her with additional attorney's fees.[11]

**FACTOR TWO: GEIGER'S ABILITY TO PAY.** Geiger's claim of insolvency is contradicted by his 2005 tax return, which reports a total income of $_____. *See,* 2005

---

[10]Geiger's complaint complained that the Plan Administrator's determination that the QDROs were qualified violated ERISA's procedures in various respects. However, the relief requested by Geiger makes clear that he had no interest in rectifying the Plan Administrator's purported lapses for the benefit of all plan beneficiaries. The relief Geiger requested was that the QDROs entered by the state court be declared not QDROs, and that the Plan Administrator be permanently enjoined to restore to him the interests in his Plans assigned to Leeds and from assigning any interest in his plans to Leeds in the future.

[11]Geiger caused Leeds' accounts to remain frozen, despite two state court orders, first entered on March 29, 2005, declaring that Leeds should have the right to "roll over" the funds into accounts of her choosing, first by challenging the Plan Administrator's qualification of the QDROs and then by commencing this lawsuit. This has arguably damaged Leeds financially, because $246,866 of the benefits awarded to her is in the form of cash frozen in a money market account and the other two accounts in the amount of $263,415 and $82,497 remain frozen in

federal tax return of David R. Geiger, form 1040, attached as Ex. 10.   After payment of

unallocated alimony and child support, he reports an adjusted gross income of $_____.  This

contrasts with the support he pays to Leeds in the amount of $138,000 annually, which is taxable

to Leeds.[12]  While the parties' divorce was pending, Geiger was able to put aside funds for

savings and his retirement, while Leeds was compelled to use a considerable amount of her

savings for the day-to-day support of herself and the children and even then was forced to reduce

her expenses.  *See*, Massachusetts Appeals Court Memorandum and Order Pursuant To Rule

1:28, previously filed herein, at  25.

     Geiger can be expected to argue that Leeds has beneficial interests in three substantial

family trusts.  Leeds' interest in the principal of one of the trusts was included in the calculation

of marital assets awarded to Leeds in the parties' divorce.  Leeds has been compelled to use

distributions from that trust to pay her very substantial attorney's fees, thereby diminishing the

equitable division of marital property made to her.  The Massachusetts Appeals Court affirmed

the trial court's conclusion that Leeds' interest in the principal of the other two trusts is nominal,

given the discretionary natures of the trusts, the generational aspects of the trusts, the history of

the trusts, and the absence of any distribution of principal to Leeds.   *See*, Massachusetts Appeals

Court Memorandum and Order Pursuant To Rule 1:28, previously filed herein, at 16-19.

     This court should also consider in regard to Geiger's ability to pay the fact that Geiger

can litigate to his heart's content, while keeping his attorneys fees at a minimum, because Geiger

has the ability to do, and in fact does, much of his own legal work, even when represented by

---

investments of Geiger's choosing.  *See,* Ex.  8.

    [12]In addition, Leeds has nominal income of $55 a week from work as a dance teacher, and income of about $349 a week from family trusts.  *See*, Massachusetts Appeals Court

counsel.[13]  The trial court found that as of the commencement of the divorce trial (March 29,

2004), the wife had incurred $206,286 in counsel fees while the husband had incurred $116,631

in counsel fees.[14]  *See,* Ex. 11, at 1.  Since the divorce trial, the gap between Leeds' and Geiger's

attorney's fees has only widened.  Geiger has represented himself in this proceeding and has

represented himself in the never-ending Probate Court proceedings since October, 2004.  Leeds

on the other hand has incurred attorney's fees totaling about $400,000 since filing her complaint

for divorce in 1999.

     **FACTOR THREE: DETERRENCE.**  An award of fees in this case will deter other

divorce litigants from burdening their spouses with duplicative litigation in federal court in an

attempt to obstruct and delay the assignment of retirement benefits to their spouses in accord

with a state court judgment.  It will also deter other divorce litigants from attempting to relitigate

in federal court ERISA issues finally determined by a state court or from attempting to litigate in

federal court issues which they had an opportunity to litigate in state court but chose not to.

---

Memorandum and Order Pursuant To Rule 1:28, previously filed herein, at 24.

    [13]The divorce trial judge found that, even when the husband was represented by counsel, he frequently prepared and/or assisted in the preparation of pleadings, memoranda and other submissions, including appellate findings.  *See,* Massachusetts Probate Court Supplemental Findings of Fact, attached as Ex.   , at 2.  In this case, Geiger used the fact that he "was in the midst of drafting an Appeals Court brief" in his divorce appeal (although he was represented by counsel on his appeal) as his reason for being unable to confer with the Defendants in regard to their Motion For Entry of Order.  *See,* Plaintiff's Opposition To Defendants' Motion For Entry of Order at 2 n. 3.

    [14]The court awarded Leeds $45,000 in attorney's fees in connection with the divorce – apparently splitting the difference between Leeds' and Geiger's' attorney's fees at that time. That award, made in October, 2004, has yet to be paid.  For reasons unknown, the trial judge granted Geiger a stay of that award (but not of the divorce judgment) pending appeal.  Geiger recently filed in the Massachusetts Supreme Judicial Court a very tardy Application For Further Appellate Review of the Appeals Court decision affirming the divorce judgment, and so has yet to pay the award of fees.

Although the federal court has concurrent jurisdiction with state courts to determine whether a QDRO is qualified, it is in the public interest, as well as in the interest of alternate payees, that this determination be made in the state court where the parties' divorce was heard. *See*, discussion in Factor Five, *infra*.

**FACTOR FOUR: COMMON BENEFIT.** Leeds' motion which resulted in the swift dismissal of Geiger's action has benefited all members of the retirement plans sued by Geiger. The defendants, comprised of the retirement plans and Foley Hoag, the plan administrator, have been relieved of the burden and expense of appearing and litigating this action. Ironically, Leeds has benefited Geiger's own law firm, in which he is a partner.

**FACTOR FIVE: RELATIVE MERITS.** As this court correctly observed, Geiger's opposition to Leeds' motion to dismiss rested entirely on his patently erroneous assertion that the state court did not in fact determine that the Orders qualified as QDROs under applicable federal law. This court concluded, with ample record support, that the state court clearly determined that the Orders were QDROs, and was dedicated to maintaining their status as such in the future.

` This lawsuit is yet another example of what the Massachusetts trial court and Appeals Court characterized as Geiger's "scorched earth" approach to the underlying divorce proceeding. *See*, Massachusetts Appeals Court Memorandum and Order Pursuant To Rule 1:28, previously filed herein, at 1. Geiger makes arguments based on the literal terms of a statute and pays no heed to case precedent, rules of statutory construction, or common sense. Geiger's deliberate strategy to forego litigation in the state court of the question whether the Orders are qualified for purposes of ERISA and to bring this action rested on his facile assertion that federal courts have

exclusive jurisdiction over this question.[15]  Every court that has considered the jurisdictional

question has rejected the notion that Congress intended to give federal courts exclusive

jurisdiction over the determination of the qualification of QDROs.  This is the inevitable

conclusion when considerations of fairness, judicial economy, legislative history and common

sense are taken into account.  In the leading case of *Oddino v. Oddino,* 16 Cal.4th 67, 939 P.2d

1266, 65 Cal.Rptr.2d 566 (1997), the court stated:

> It seems highly unlikely Congress, acting to protect the rights of former spouses and dependents as adjudicated in state court, would, at the same time, have deprived them of their existing ability to obtain enforcement of those rights in state court and required them instead to initiate a separate lawsuit in federal court whenever a retirement plan disputed the qualified status of the state court order.
>
> Because federal courts cannot themselves issue or modify domestic relations orders. . . , separate litigation of the QDRO issue in federal court presents the potential for an expensive and time-consuming course of parallel litigation, including possible appeals, in the two court systems.  Few of the former spouses and dependents whose interests REA was intended to protect could afford such expense or delay in determination of their income.  *Oddino v. Oddino*, 16 Cal.4th at 80-81.

Elsewhere in *Oddino v. Oddino* the court endorsed the view that Congress could not have

intended that federal courts have exclusive jurisdiction, because "[t]his would cause undue

hardship, expense and delay to the affected party, and impose an unnecessary workload on

already overburdened federal courts."[16]   *Oddino v. Oddino*, 16 Cal.4th at 76.

---

[15]Geiger cited no authority in support of his view.  His argument consisted entirely of his declaration that ERISA unambiguously provides that federal courts have exclusive jurisdiction. *See,* Plaintiff's Opposition To Motion To Dismiss and Request For Sanctions at 6 n. 6.

[16]Geiger is continuing his expensive and time-consuming course of parallel litigation.  He has filed a notice of appeal from the Judgment of Dismissal entered in this case.

**CONCLUSION**

All of the factors applicable to a motion for attorney's fees favor Leeds in this case. An

order should enter awarding Leeds the attorney's fees she has incurred in defense of this action.

Dated:  January 26, 2007                    Respectfully submitted,

                                            KAREN LEEDS,

                                            By her attorneys,

                                            RUBIN AND RUDMAN, LLP


                                             /s/ Frances M. Giordano_____
                                            By: Frances M. Giordano, BBO #556769
                                            50 Rowes Wharf
                                            Boston, MA 02110
                                            (617) 330-7000

                                            Ann Wagner, BBO #545738
                                            60 Seaview Avenue
                                            Marshfield, MA 02050
                                            (781) 834-0509


                        **CERTIFICATE OF SERVICE**

        I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on this 26th day of
January, 2007.


                                            /s/_Frances M. Giordano_____
                                            Frances M. Giordano